# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KELSEY FISHER,

     Plaintiff,

v.

    Case No. 18-2664-DDC-ADM

BASEHOR-LINWOOD UNIFIED SCHOOL
DISTRICT NO. 458,

     Defendant.

## MEMORANDUM AND ORDER

Defendant Basehor-Linwood Unified School District No. 458 employed plaintiff Kelsey Fisher as a middle school teacher from 2015 until 2018. After defendant terminated her employment in March 2018, she filed this lawsuit, alleging discriminatory treatment and retaliation under the Americans with Disabilities Act ("ADA"). This matter comes before the court on defendant's Motion for Summary Judgment (Doc. 45). Plaintiff has filed a Memorandum in Opposition (Doc. 50), and defendant has filed a Reply (Doc. 53). For reasons explained below, the court grants summary judgment against plaintiff's claims.

## I.    Uncontroverted Facts

The following facts are either stipulated by the parties in the Pretrial Order (Doc. 41), uncontroverted, or, where genuinely controverted, are stated in the light most favorable to plaintiff, the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378–80 (2007).

### *Defendant's Policies*

Defendant is a unified school district and governmental subdivision of the state of Kansas, organized and existing under Article 6, § 5 of the Kansas Constitution and Kan. Stat.

Ann. § 72-1131–72-1181.  An elected Board of Education governs defendant.  Defendant

maintains policies adopted by its governing Board of Education prohibiting discrimination and

retaliation based upon disability and provides a process for employees and others to make

complaints about alleged discrimination and retaliation.  Specifically, defendant maintains the

following policies:

- Defendant's Board Policy GAAA—Equal Opportunity Employment and Nondiscrimination—provides the Board shall not discriminate in its employment practices and policies with respect to hiring, compensation, terms, conditions, or privileges of employment because of an individual's disability, or any other basis prohibited by law.  Doc. 46-2 at 2.

- Defendant's Board Policy GAAA—Equal Opportunity Employment and Nondiscrimination—provides inquiries about compliance may be directed to Superintendent of Schools, P.O. Box 282, Basehor, Kansas, 66007, (913) 724-1396.  *Id.*

- Defendant's Board Policy GAAB—Complaints of Discrimination—provides that the District is committed to maintaining a working and learning environment free from discrimination due to disability or any other bases prohibited by law.  Complaints of discrimination should be addressed to an employee's supervisor or to the building principal or compliance coordinator.  Complaints are resolved using the District's complaint discrimination procedures.  This policy also provides the District prohibits retaliation or discrimination against any person for opposing discrimination.  Doc. 46-3 at 2–3.

- Defendant's Board Policy KN—Complaints—provides discrimination against any individual on the basis of disability during employment in the District's programs and activities is prohibited.  This policy provides for both formal and informal complaint procedures with appeal available up to the Board of Education.  Doc. 46-4 at 2–7.

Defendant's teachers are covered by the Interest-Based Bargaining Agreement between

defendant and the Association of Basehor-Linwood Educators.  Plaintiff received a copy of the

faculty handbook in each of the three school years defendant employed her.

### Plaintiff's Employment at Basehor-Linwood Middle School

Defendant employed plaintiff as a certified teacher at Basehor-Linwood Middle School for the 2015-16, 2016-17, and 2017-18 school years.  An individual written teacher's contract governed her employment.  During plaintiff's tenure at the middle school, Amy Garver ("Principal Garver") served as principal and Garold Baker ("Assistant Principal Baker") served as assistant principal.  David Howard ("Superintendent Howard") served as superintendent.

Plaintiff "took seriously" her job responsibilities of "educating and facilitating current and former students" and "adhering to the designated school curriculum."  Doc. 50-1 at 2 (Plaintiff Decl. ¶ 3).  But plaintiff struggled with "classroom management" in her first year of teaching, and these problems "continued but improved" in her second and third years of teaching.[1]  Doc. 46-5 at 40 (Plaintiff Dep. 184:11–17).  For example, Principal Garver recorded

---

[1]     Plaintiff testified by affidavit that she "effectively deal[t] with classroom management and maintain[ed] a safe and quality setting for students within the classroom" during her employment.  Doc. 50-1 at 2 (Plaintiff Decl. ¶ 3).  Defendant seeks to exclude this testimony because, it asserts, plaintiff merely is attempting to create a "sham fact issue" to survive summary judgment.  Doc. 53 at 14.  The court agrees with defendant.

When deciding "whether a material issue of fact exists, an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements."  *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) (quoting 10A C. Wright & Miller, *Federal Practice and Procedure* § 2738, at 473–74 (2d 1983)) (further citation omitted).  But a court "will disregard a contrary affidavit when [it] conclude[s] that it constitutes an attempt to create a sham fact issue."  *Id.* (citations omitted).  "Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain."  *Id.*  "[C]onclusory and self-serving affidavits are not sufficient" to create a genuine factual issue.  *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991).

Plaintiff testified in her deposition that she initially had problems with classroom management when she began teaching at the middle school, and that those classroom management issues "continued but improved" during her second and third years of teaching.  Doc. 46-5 at 40 (Plaintiff Dep. 184:11–17).  The conclusory assertion in plaintiff's affidavit that she "effectively deal[t] with classroom management and maintain[ed] a safe and quality setting for students within the classroom" appears designed to controvert her deposition testimony that she had problems with classroom management, and the various examples of incidents that occurred in her classroom reflecting those classroom management problems.  The court agrees that plaintiff has tried to create a sham fact issue on this point.  Plaintiff was subject to

in plaintiff's "teacher observation form" for the 2015-16 school year that during plaintiff's classroom activity, students were visiting with each other, working on homework for other classes, and "goofing off." *Id.* at 40–41 (Plaintiff Dep. 185:24–186:13).

On October 6, 2015, an incident occurred in plaintiff's classroom, prompting plaintiff to say to her class—out of frustration— "this is why I hate this class." *Id.* at 41 (Plaintiff Dep. 188:16–19). Plaintiff informed Principal Garver about the comment she had made to the class. She also knew that several students had complained to Principal Garver. Principal Garver issued plaintiff a disciplinary reprimand. *See* Doc. 46-6. Plaintiff agreed with Principal Garver's discipline resulting from this situation. Plaintiff didn't know that Principal Garver had received other complaints from parents about her behavior in the classroom in February 2016. Doc. 46-5 at 42 (Plaintiff Dep. 190:25–191:3).

Principal Garver issued plaintiff a second written reprimand in April 2016 after she said the word "shit" in front of her students. *Id.* at 43 (Plaintiff Dep. 193:16–19). When plaintiff made this comment, a student volunteered that they would not report the comment if plaintiff bought them pizza. Plaintiff never agreed to buy pizza for the class, but the student who made the comment had the impression that plaintiff had agreed to the exchange. Then, on November 15, 2017, Principal Garver addressed an incident with plaintiff where she had explained the meaning of the word "gangbanging" to students. Doc. 46-8 at 3 (Garver Dep. 23:12–20).

---

cross-examination during her earlier testimony, she had access to the pertinent evidence at the time of her deposition, and no confusion about the facts exists. *Franks*, 796 F.2d at 1237. The court thus excludes her affidavit testimony that she "effectively deal[t] with classroom management and maintain[ed] a safe and quality setting for students within the classroom." Doc. 50-1 at 2 (Fisher Decl. ¶ 3). *See Hall*, 935 F.2d at 1111 (holding that "[c]onclusory and self-serving affidavits are not sufficient" to create a genuine factual issue).

According to Principal Garver, "classroom management" is a "huge part" of teaching. *Id.* at 23 (Garver Dep. 114:19–22). Principal Garver believed plaintiff struggled with this skill. *Id.* (Garver Dep. 115:20–25). In plaintiff's first year teaching at the middle school, plaintiff had one year of mentorship, *i.e.*, another teacher training her, assisting her, and providing her feedback. *Id.* (Garver Dep. 116:6–13). In her second year of teaching, a teacher provided consultation and checking in with plaintiff. *Id.* According to plaintiff, the welfare and safety of students is a priority for teachers.

### *Plaintiff's Disability*

Plaintiff has Post-Traumatic Stress Disorder ("PTSD"). Doc. 50-1 at 2 (Plaintiff Decl. ¶ 2); Doc. 50-11 at 6 (Mays Dep. 19:9–16). Her symptoms include stress, anxiety, elevated heart rate, shortness of breath, panic attacks, nightmares, and insomnia. Doc. 50-1 at 2 (Plaintiff Decl. ¶ 2). These symptoms impair her sleep and concentration. *Id.* She experiences chronic and incapacitating sleeplessness. *Id.* Dr. Kevin Mays, a psychiatrist, began treating her in November 2017. Doc. 50-11 at 4 (Mays Dep. 12:9–15). He has prescribed various medications for her sleeping problems. *Id.* at 17 (Mays Dep. 63:16–19). According to Dr. Mays, plaintiff's PTSD "negatively affect[s]" her sleep. *Id.* (Mays Dep. 62:13–19).

Plaintiff's disorder stems from a sexual assault she sustained. Doc. 50-1 at 2 (Plaintiff Decl. ¶ 2). During plaintiff's first year teaching at the middle school, she had shared with some co-workers—including Principal Garver—that she was a victim of a sexual assault. But Principal Garver didn't remember plaintiff disclosing a disability diagnosis. Doc. 46-8 at 26 (Garver Dep. 126:4–8). Nor did plaintiff seek accommodation for a disability. *Id.* (Garver Dep. 126:19–21). According to plaintiff, she "declined on one or more occasions" to answer questions about her mental health treatment and history, and during her employment, she

"became concerned with whether [defendant's] administration was properly observing the legal rights of employees . . . seeking non-discriminatory treatment." Doc. 50-1 at 2 (Plaintiff Decl. ¶ 4). According to Principal Garver, had plaintiff asked for an accommodation, she would have "contacted central office" and "worked out a plan that would have helped." *Id.* (Garver Dep. 127:1–7).

### *Plaintiff's Panic Attack*

Sometime around November 16, 2017, plaintiff had a panic attack at school. This panic attack occurred near the end of the school day, while plaintiff was in her classroom supervising 25 eighth grade students. Plaintiff's symptoms consisted of a racing heart, irregular heartbeats, trouble catching her breath, and a feeling that the room was narrowing around her. Feeling she was "in distress," she stepped out of her classroom and into the hallway. A teacher across the hall saw her and came to check on her. The teacher told plaintiff she looked pale, and that it probably would be best if she arranged coverage for her classroom and left for the day. Plaintiff remained near her classroom while the other teacher went to the school office to seek help. Principal Garver then returned to plaintiff's classroom with a different teacher who could supervise plaintiff's class in her absence. Principal Garver walked plaintiff to the school nurse's office. The nurse checked plaintiff's blood pressure and pulse. Both were elevated. The nurse also listened to her heartbeat, which was racing. She recommended plaintiff go to an urgent care facility.

Principal Garver drove plaintiff to the urgent care. When they arrived, plaintiff began completing the required paperwork, but could not remember basic information like her birthdate. Doc. 46-5 at 12 (Plaintiff Dep. 53:1–8). Plaintiff slid the clipboard toward Principal Garver, who attempted to complete the form for her. *Id.* Plaintiff didn't object to Principal Garver assisting

her with the paperwork. *Id.* (Plaintiff Dep. 54:3–6). Then, a nurse took plaintiff to an examination room. Principal Garver accompanied plaintiff into the exam room. *Id.* (Plaintiff Dep. 55:10–13). Plaintiff never asked Principal Garver to accompany her into the exam room, but she didn't object, either. *Id.* (Plaintiff Dep. 55:14–23).

When the nurse practitioner entered the exam room, she asked whether Principal Garver was plaintiff's mother. Principal Garver explained that she wasn't. The nurse practitioner asked Principal Garver who she was and what her title was. She asked plaintiff whether Principal Garver should remain in the room. Plaintiff testified by affidavit that she never provided "explicit, verbal" consent for Principal Garver to remain in the room.[2] But Principal Garver remained in the room during the exam. Doc. 46-8 at 5 (Garver Dep. 33:4–19). She sat in a chair in the corner of the room and read emails on her phone. *Id.* (Garver Dep. 33:20–25).

During the exam, plaintiff shared that she was depressed and experiencing anxiety. Doc. 46-8 at 5 (Garver Dep. 35:6–10). She explained that the death of a high school classmate—who had been hit and killed by a car the week before—had triggered her panic attack. Doc. 46-5 at 13 (Plaintiff Dep. 59:1–9). The circumstances of her former classmate's accident reminded her of an incident where she had been "roofied" and sexually assaulted when she was 21 years old.

---

[2]      Principal Garver testified that plaintiff gave her permission to remain in the room when the nurse asked whether plaintiff wanted her to in the examination room. Doc. 46-8 at 5 (Garver Dep. 33:1–19). Plaintiff testified in her deposition that she never told any medical providers she didn't want Principal Garver in the room because she didn't feel like she had the power to do so, as Principal Garver was her boss and she was distressed. Doc. 46-5 at 12 (Plaintiff Dep. 55:24–56:5). But, plaintiff later testified by affidavit that she never gave "explicit, verbal consent" for Principal Garver to remain in the exam room with her. Doc. 50-1 at 2–3 (Plaintiff Decl. ¶ 5). Defendant seeks to exclude plaintiff's testimony that she never consented to Principal Garver's presence in the examination room as another attempt to create a sham fact issue. On this dispute, the court declines defendant's invitation to view this dispute as a sham. Instead, the court views the facts in the light most favorable to the plaintiff and accepts plaintiff's proposition that she never gave "explicit, verbal consent" to Principal Garver to remain in the examination room. Whether plaintiff consented—or not—doesn't influence the court's consideration of her ADA claims.

*Id.* at 13–14 (Plaintiff Dep. 60:20– 61:5).  Plaintiff didn't recall sharing other details about this incident with the nurse practitioner.  The nurse practitioner responded that her symptoms—*i.e.*, her former classmate's accident causing a panic attack—sounded like symptoms of PTSD.  Doc. 46-5 at 13 (Plaintiff Dep. 58:5–8).  Plaintiff already was taking an anti-anxiety medication, and the nurse practitioner prescribed her a different one.  She also told plaintiff she should schedule a session with her counselor.  Principal Garver's notes from the urgent care visit reflect that the nurse practitioner prescribed medication for plaintiff, permitted her to drive herself home, and instructed plaintiff to go home, relax, and use calming techniques.  Doc. 46-8 at 5 (Garver Dep. 34:5–14).  Principal Garver testified she otherwise remembered no details from the exam.  *Id.* (Garver Dep. 34:15–18).

After the exam, Principal Garver drove plaintiff back to the middle school.  She "suggested that [plaintiff] take a mental health day" off work the next day.  Doc. 46-5 at 15 (Plaintiff Dep. 65:3–10).  Later, at 4:25 p.m., Principal Garver sent plaintiff a text message asking if she had made it home.  Plaintiff responded, saying "not going to lie to you, it's all sinking in now that this occurred at my job today.  It's not sitting well, even after the Valium. Not sure what my next move should be."  *Id.* at 59 (Plaintiff Dep. 270:22–271:5).  Principal Garver replied that plaintiff should call her counselor and take the next day off work for her mental health.  *Id.*  She told plaintiff that her health and well-being were "far more important than any job."  *Id.* at 60 (Plaintiff Dep. 273:5–10).

The next morning—before taking off the rest of the day—plaintiff met with Principal Garver.  She shared that she was embarrassed about Principal Garver having been in the exam room the day before.  Principal Garver responded that it was okay, and that she wanted staff "to be able to talk to [her] about things."  *Id.* at 15 (Plaintiff Dep. 66:8–13).  She also suggested Bo

Youngblood and Kathryn Harter as resources for plaintiff.  *Id.*  Defendant employed Dr.

Youngblood part-time as a psychologist, and Ms. Harter served as the school's social worker.

That evening, plaintiff sent Principal Garver a text message asking for contact information for

Dr. Youngblood and Ms. Harter.  According to plaintiff, a teacher having a panic attack in the

classroom, and being unable to continue teaching, would be a "cause for concern."  *Id.* at 21

(Plaintiff Dep. 89:4–12).

### Principal Garver's Call to the Suicide Hotline

On November 28, 2017, Assistant Principal Baker met with plaintiff about an incident

where a student sustained a head injury in her classroom.  He had learned about the incident from

another student and called plaintiff to his office to meet with her about it.  According to plaintiff,

Assistant Principal Baker attributed the injury to her "classroom management."  Doc. 46-5 at 17

(Plaintiff Dep. 74:18–75:2).  After the meeting, plaintiff left the middle school for an

appointment with her counselor.

Shortly before her appointment, plaintiff sent a text message to Principal Garver, asking

her again for Ms. Harter's contact information.  Principal Garver responded a few minutes later

with Ms. Harter's phone number.  Plaintiff replied by text message, saying "she's the person who

deals with suicide/depression, right?"  *Id.* at 60 (Plaintiff Dep. 276:13–17).  According to

plaintiff, she asked for Ms. Harter's contact information to provide to a student.  Doc. 50-1 at 3

(Plaintiff Decl. ¶ 7).  Two minutes later, Principal Garver responded that Ms. Harter was the

social worker.  She sent another text a minute later asking if plaintiff was concerned about a

student.  Plaintiff responded, "I guess I don't know what that entails but am trying to get

connected with the right person."  Doc. 46-5 at 60 (Plaintiff Dep. 276:18–25).  Plaintiff then sent

a text message to Ms. Harter, identifying herself and asking if she had reached the right person.

Ms. Harter confirmed that plaintiff had reached her.  Plaintiff responded, asking whether Ms. Harter would be in the school that week so they could schedule a meeting.  Plaintiff then put away her phone and began her counseling appointment.

Meanwhile, Principal Garver didn't understand plaintiff's response to her text message, *i.e.*, "I guess I don't know what that entails but am trying to get connected with the right person." Doc. 46-8 at 6 (Garver Dep. 39:7–13).  Twenty minutes after her text inquiring whether plaintiff was concerned about a student, she sent another text to plaintiff.  In that text, she asked if plaintiff was concerned for herself or a student.  Principal Garver continued to text plaintiff but received no response from plaintiff.  Principal Garver also contacted Dr. Youngblood and Ms. Harter to see if they had heard from plaintiff.  Ms. Harter responded that she had received a text message from plaintiff at 6:50 p.m., but then the messages had stopped.  The three of them decided that, out of caution, Principal Garver should call for a welfare check on plaintiff.  *Id.* (Garver Dep. 39:23–40:3).  Twenty minutes after plaintiff failed to respond to her question whether she was concerned about herself or a student, Principal Garver sent plaintiff a text message, saying she was worried and was "calling the Lenexa hotline and having someone come out to [plaintiff's] house."[3]  Doc. 46-5 at 17 (Plaintiff Dep. 73:12–16).  Principal Garver then called the suicide hotline and informed the person she spoke with that she had received a text from plaintiff about depression and suicide, and that she wanted a welfare check.  According to Principal Garver, she was worried about plaintiff's welfare, and would have made the same call for anyone else.

---

[3]      Plaintiff lived in Lenexa, Kansas when this incident occurred.  Dr. Youngblood provided Principal Garver with a number to call to request a welfare check on plaintiff in Lenexa.  Principal Garver called this "Lenexa hotline," but didn't remember the name of the hotline or the identity of the person she had talked to when she made this call.  Plaintiff referred to the recipient of this call as the "suicide hotline" in her deposition and affidavit, so the court uses that term in this Order.

After her counseling session, plaintiff went to her car.  She looked at her phone and saw text messages from Principal Garver and missed calls from Ms. Harter and Dr. Youngblood. Plaintiff testified that she could understand why the timing of the text messages would have alarmed Principal Garver.  *Id.* at 61 (Plaintiff Dep. 277:13–25).  And, she testified, Principal Garver may have observed that plaintiff was upset after her meeting with Assistant Principal Baker that afternoon.  Plaintiff immediately returned Ms. Harter's call to "clarify the misunderstanding."  *Id.* at 17 (Plaintiff Dep. 73:20–24).  Later that evening, Principal Garver called Assistant Principal Baker to inform him of what had happened with plaintiff.  She also called Superintendent Howard and told him about plaintiff's panic attack earlier that month.

Later that evening, plaintiff sent a text message to Principal Garver, asking that she not share with Assistant Principal Baker what had happened, because he was plaintiff's direct supervisor.  Plaintiff didn't want Assistant Principal Baker to think that their meeting earlier in the day about the student's head injury had any connection to the evening's events.  Principal Garver responded to plaintiff, telling her that she already had notified Assistant Principal Baker. She also informed plaintiff that she had notified plaintiff's father about the incident.  Principal Garver had contacted a former employee—who was an acquaintance of plaintiff's father—for his phone number.  Principal Garver had met plaintiff's father before when he had come to the school to help plaintiff in her classroom.[4]  She expressed concern to plaintiff's father about plaintiff's well-being, and shared that she had called for a welfare check on her.  Plaintiff's father assured Principal Garver that he or another family member would check on plaintiff.  Plaintiff

---

[4]       The summary judgment record is unclear about the assistance plaintiff's father provided.  In context, it appears plaintiff's father may have assisted her with setting up or organizing her classroom during times when students were not in the building.

never approved Principal Garver's call to the suicide hotline, or the call to her father, and these events upset her.  Doc. 50-1 at 3 (Plaintiff Decl. ¶ 7).

### Events After the Welfare Check

The next day—November 29, 2017—plaintiff sent a text message to Ms. Harter.  Plaintiff expressed embarrassment about the police coming to her house the night before.  Ms. Harter responded, in essence, that she, Principal Garver, and Dr. Youngblood felt like they had done what was best in a life-or-death situation and wanted to make sure plaintiff was safe.[5]

On November 30, 2017, Principal Garver met with plaintiff.  She also invited Assistant Principal Baker to attend the meeting.  Principal Garver wanted to check on plaintiff's well-being.  Doc. 50-4 at 3 (Garver Notes).  Plaintiff testified that Principal Garver and Assistant Principal Baker had wanted to meet with her "as a follow[-]up from the welfare check" and to see how she was doing.  Doc. 46-5 at 21 (Plaintiff Dep. 91:7–16).  Principal Garver asked plaintiff about her meeting with the psychiatrist.[6]  Doc. 46-5 at 20 (Plaintiff Dep. 86:10–15); Doc. 50-4 at 3 (Garver Notes).  Plaintiff responded that she didn't want to talk about her personal

---

[5]    Principal Garver testified that she never "reached a conclusion" whether plaintiff was suicidal that evening.  According to plaintiff, Principal Garver explained to her at some point that she had "jumped the gun" when she called the hotline for a welfare check because earlier, a teacher at one of defendant's other schools had committed suicide.  Plaintiff, however, didn't believe Principal Garver was worried about her safety when she called for a welfare check.  Instead, plaintiff believed Principal Garver "was just doing what she thought she had to do in the event that something happened."  Doc. 46-5 at 18 (Plaintiff Dep. 79:25–80:5).

[6]    Plaintiff had told Ms. Harter that she had scheduled an appointment with a psychiatrist.  Doc. 46-5 at 21.  Indeed, Dr. Kevin Mays, plaintiff's psychiatrist, testified that plaintiff's first appointment with him occurred on the morning on November 29, 2017.  Doc. 50-11 at 4 (Mays Dep.).  According to plaintiff, the only way Principal Garver could have learned about this appointment was from Ms. Harter.  Principal Garver testified that when she asked about plaintiff's psychiatric appointment, she actually meant plaintiff's appointment with her counselor the evening of November 28, when Principal Garver had called the hotline for a welfare check.  Doc. 46-8 at 8 (Garver Dep. 47:20–48:1).  The court provides this background information solely for context.  The particular appointment Principal Garver asked about and how she learned of it do not influence the court's analysis of plaintiff's claims.

life.  Doc. 46-8 at 8 (Garver Dep. 46:17–25-49:1–2); Doc. 50-4 at 3 (Garver Notes).  Principal

Garver responded that when plaintiff's personal life began to interfere with her job performance,

they needed to talk about it.  Doc. 50-1 at 3 (Plaintiff Decl. ¶ 8); Doc. 50-4 at 3 (Garver Notes).

Principal Garver's notes from the meeting reflect that "it was obvious [plaintiff] did not want to

engage in conversation with [her], and [the] meeting was over."  Doc. 50-4 at 3 (Garver Notes).

Plaintiff testified that she understood why Principal Garver had asked about her mental health,

but objected to her doing so in front Assistant Principal Baker.  Assistant Principal Baker never

had heard Principal Garver ask a teacher about his or her mental health during a meeting before.

According to Principal Garver, she wasn't concerned about plaintiff's emotional stability.

Doc. 46-8 at 24 (Garver Dep. 118:18–119:4).  But, as principal, she was concerned about "what

is happening in the classroom every day" and whether "students are safe and being taught their

academics."  *Id.*  During November and December 2017, she and Assistant Principal Baker never

discussed plaintiff's emotional and mental health.  And they never discussed whether plaintiff's

sexual assault was affecting her emotional condition.

### *Plaintiff's Suspension*

Around the end of the school's winter break in January, Principal Garver received a

complaint from a parent about an incident that had occurred in plaintiff's classroom in December

2017, the day before winter break began.  The incident involved students playing a game that

involved saying the word "penis."  Doc. 50-10 at 64 (Plaintiff Dep. 250:17–23).  Principal

Garver and Assistant Principal Baker investigated the matter when they returned from winter

break.  They questioned students who had been in the class about what had occurred and took

statements from them.  According to plaintiff, the game was a minor, one-time incident that had

occurred a month before plaintiff learned about the complaint.  *Id.* (Plaintiff Dep. 251:20–

252:13).  Principal Garver's investigation, however, concluded that plaintiff had "roasted" a

student by referencing the size of his penis or him playing with his penis.  Doc. 46-8 at 12

(Garver Dep. 62:1–12).  Principal Garver concluded that plaintiff had taken "no action to truly

stop" the students' behavior, and "somewhat participated" in the behavior by referencing the

student's penis.  *Id.* at 13–14 (Garver Dep. 68:16–69: 2).  According to Assistant Principal

Baker, the investigation revealed that plaintiff knew students were playing this game.  Doc. 46-

10 at 6 (Baker Dep. 39:18–25).  Plaintiff, according to Assistant Principal Baker, told the

students to stop the behavior, but it continued.  *Id.*

Principal Garver discussed the incident with Superintendent Howard, and they decided to

suspend plaintiff, with pay, for two days.  Principal Garver believed the incident warranted

suspension because of the "severity of making fun or talking about a student's private part in

front of an entire class."  Doc. 46-8 at 12 (Garver Dep. 63:8–13).  Consistent with Board of

Education policy, Superintendent Howard attended the suspension meeting.  Superintendent

Howard also called Dayna Miller, President of the Board of Education, to inform her of

plaintiff's suspension.  Plaintiff served her suspension on January 17 and 18, 2018.  Plaintiff

provided a response—written by her KNEA representative—to the discipline she received.[7]

### The Pep Assembly Incident

Plaintiff returned from her two-day suspension on Friday, January 19, 2018.  Sometime

that day, a female student, L.A., used plaintiff's computer to prepare a written statement

---

[7]      The summary judgment record doesn't define the acronym "KNEA."  Nor does it explain what
the role of the KNEA representative is or the substance of plaintiff's response to her discipline.  In
context, it appears a KNEA representative is a representative from the teacher's union assigned to the
teachers in defendant's district.

asserting that other students had bullied her.  Afterward, plaintiff deleted the statement.  Plaintiff never reported L.A.'s concerns to her parents or school counselors or administrators.

Then, later that day during 7th period, S.P.—a female student in plaintiff's class—asked to talk to her.  Doc. 46-5 at 29 (Plaintiff Dep. 129:15–18).  Plaintiff invited S.P. to sit at a table in the back of the classroom and talk, although S.P. should have been completing the classroom activity plaintiff had assigned.  L.A., who also was in the class, immediately joined their conversation.  S.P. shared with plaintiff she was having trouble with a group of friends who also were family members.  She made no specific complaints, just expressed frustration with her classmates, and females generally being "catty."  *Id.* (Plaintiff Dep. 132:20–25).  During her conversation with S.P. and L.A., a high school student, A.M, entered the room and came to the back table, as she typically did when she visited plaintiff's classroom.[8]  She joined the conversation among S.P., L.A., and plaintiff.

When the class period ended, the students were supposed to proceed to their 8th period class.  S.P. and L.A. asked if they could remain in plaintiff's classroom for 8th period.  Plaintiff told them they needed permission from their 8th period teachers to stay in her classroom.  *Id.* Plaintiff was assigned to teach a class of 7th graders for her 8th period class.  Plaintiff started the 7th graders on their class assignment.  S.P. and L.A. returned to plaintiff's classroom during that 8th period to continue their discussion.

At the end of 8th period, an announcement over the intercom dismissed students from class to attend a pep assembly in the gymnasium.  Principal Garver expected the entire school to attend this assembly, and for teachers to sit with their students in designated areas.  The three

---

[8]      A.M. was an 18-year-old female high school student enrolled in the "Care Cat" mentoring program.  This program assigned high school students to serve as teacher's aides and tutors in the district's classrooms.

students—S.P., L.A., and A.M.—asked if they could stay in plaintiff's classroom with her instead of attending the assembly.  Plaintiff agreed.  Doc. 46-5 at 33 (Plaintiff Dep. 154:12–17).  Plaintiff never sought approval for the students to miss the assembly.  While plaintiff was with the students in the classroom, the overhead, fluorescent lights shut off because they were on a motion timer.  But the room wasn't dark because plaintiff had turned on the replacement, hue light bulbs she sometimes used in her classroom.  *Id.* at 23 (Plaintiff Dep. 103:9–20).  During their conversation, plaintiff permitted the students to read the letter of reprimand about her suspension and discussed her discipline with the students.  *Id.* at 52 (Plaintiff Dep. 234:22– 235:3).

        Meanwhile, during the assembly, Assistant Principal Baker took roll of the teachers.  He noted plaintiff's absence.  At the end of the assembly, he informed Principal Garver that plaintiff had been absent.  Principal Garver also had noticed.  After the assembly, she escorted plaintiff's students back to her classroom.  When Principal Garver arrived at plaintiff's classroom, she opened the door and turned on the lights to let the students back in the room.  Principal Garver saw plaintiff and the three students sitting at the back table.  After she opened the door, the students in the hallway entered the room to gather their belongings and leave for the day.  S.P., L.A., and A.M. also began leaving the classroom.  Before they left, plaintiff told them not to let the administration "back [them] into a corner" when questioned about being in plaintiff's classroom instead of the assembly.  Doc. 46-5 at 48 (Plaintiff Dep. 219:5–8).  Plaintiff knew she was "in trouble" for having met with the three students during the pep assembly.  *Id*. at 28 (Plaintiff Dep. 218:12–21)

        As S.P. and L.A. left the classroom, Principal Garver called out to them and asked them to come talk to her.  She wanted to know what they had been doing in plaintiff's classroom.  She

asked them why they were not at the assembly.  They explained that they were talking to plaintiff about "friend problems."  Doc. 46-8 at 20 (Garver Dep. 95:7–16).  Plaintiff saw Principal Garver trying to talk to the two students as school let out for the day, but Principal Garver didn't ask plaintiff directly what had happened or why the students had stayed in her classroom during the assembly.  Plaintiff sent a text message to S.P. at about 3:00 p.m.  It asked her what Principal Garver had said to her.  Doc. 46-5 at 46 (Plaintiff Dep. 212:18–25).  All three students—S.P., L.A., and A.M.—already had plaintiff's cell phone number.  S.P.—for reasons unknown to plaintiff—had identified plaintiff as her drug dealer in her phone contacts.

### *Monday, January 22, 2018*

Plaintiff took the following Monday—January 22, 2018—as a personal day.  Plaintiff spent time that day reviewing defendant's policies on its website.  She also sent a text message to S.P., encouraging her to "stick to [her] guns.  We discussed the issues you and [L.A.] were having with friends, see you tomorrow."  Doc. 46-5 at 47 (Plaintiff Dep. 215:15–216:6).  Plaintiff didn't intend her message to instruct S.P. what to report to the administration; she just didn't want Principal Garver to intimidate S.P.  *Id.* (Plaintiff Dep. 216:3–14).  Plaintiff didn't believe the students had an obligation to share with Principal Garver what they had discussed the Friday before.  She sent another text to S.P. later that day.  It stated "Thanks, girl!  Just warning you.  I got an email.  In case you get called in.  You got my back?  Delete these texts!  Pshhh over."  Doc. 46-14 at 5.  Plaintiff sent this text message to S.P. to make sure she "st[u]ck to what we discussed."  Doc. 46-5 at 49 (Plaintiff Dep. 222:7–15).  Plaintiff told her to delete the texts in the event the administration took her phone and read her text messages.  *Id.* (Plaintiff Dep. 224:3–9).  Plaintiff didn't want administrators reading the texts between her and S.P.

S.P. then sent a text message to plaintiff advising that she had sent an email to Principal Garver.  Curious about the contents of S.P.'s email, plaintiff responded, asking S.P. to forward the email to her.  S.P. replied to plaintiff that she had told Principal Garver she was going through some "personal shit" that she wanted to discuss with plaintiff, because plaintiff had been through the same thing.  Doc. 46-5 at 50 (Plaintiff Dep. 226:14–22).  Plaintiff replied, again asking S.P. to forward the email to her because she had "no clue" why Principal Garver wanted to meet and "need[ed] to have all [her] ducks in a row."  *Id.* (Plaintiff Dep. 227:3–9).

Sometime that day, S.P. met with Principal Garver.  S.P. then sent plaintiff a text message saying that during the meeting, she had "started to cry . . . that's right I can fake cry isn't that cool."  Doc. 46-14 at 9.  Plaintiff responded to S.P, saying "[t]hat's so good!  I'm so proud of you!  And impressed with the fake cry!  Haha.  Did you tell her what exactly our convo was in reference to?  And do you know if she talked to [L.A.]?"  *Id.*

That afternoon, Melissa Augustine—L.A.'s mother—met with Principal Garver.[9]  Ms. Augustine reported the following:  L.A. had come home from school the Friday before—after the pep assembly—and told her that Principal Garver had found her and another student in a dark room with plaintiff.[10]  Doc. 46-16 at 4 (Augustine Dep. 32:1–9).  L.A. shared that plaintiff had

---

[9]      The summary judgment record isn't entirely clear about the sequence of events on this Monday, January 22, 2018.  It is unclear when S.P. met with Principal Garver—whether it was before or after L.A.'s mother, Ms. Augustine, met with Principal Garver.  But the precise sequence of events that day doesn't influence the court's analysis of plaintiff's claims on summary judgment.

[10]      Plaintiff objects to some of defendant's statements of uncontroverted facts because—according to plaintiff—defendant has relied on inadmissible evidence for support.  Specifically, plaintiff objects to defendant's reliance on:  (1) Ms. Augustine's testimony about statements made by her daughter, L.A., attributing statements to plaintiff; and (2) Principal Garver's testimony about statements made by Ms. Augustine that attributed statements to L.A.  Plaintiff claims the statements are inaccurate and, in any event, the court cannot consider them because they are double hearsay.  *See* Doc. 50 at 4–6 (plaintiff's Response to Defendant's Statement of Uncontroverted Facts, specifying the specific factual statements at issue).  Defendant responds, explaining that it didn't offer the statements "to prove the truth of the matter asserted in the statement[s]."  *See* Fed. R. Evid. 801(c) (definition of hearsay).  The court overrules plaintiff's objection.

told her to tell Principal Garver that they had been talking about teen problems and friend issues, which L.A. did. *Id.* at 4–5 (Augustine Dep. 32:12–25, 33:1–5). But, L.A. shared, plaintiff actually had told the students about her own personal issues and that she had been raped and was attending counseling. *Id.* (Augustine Dep. 37:3–12). Ms. Augustine didn't think a teacher should share this information with students. *Id.* After learning this information, Ms. Augustine began asking L.A. more about her relationship with plaintiff. *Id.* at 6 (Augustine Dep. 37:13–24). L.A. informed her mother that plaintiff also had told her that Principal Garver had called the police to plaintiff's apartment because she believed she was suicidal. *Id.* (Augustine Dep. 37:25–38:8). L.A. also shared that plaintiff had told her she had tried drugs.[11] *Id.*

According to Principal Garver, Ms. Augustine reported that she periodically read the text messages on L.A.'s phone. She had seen texts from plaintiff on L.A.'s phone earlier in the

---

The court recognizes that Fed. R. Civ. P. 56(c)(2) permitted plaintiff, as the non-moving party, to "dispute a fact [by showing that the challenged fact] cannot be presented in a form that would be admissible in evidence." *Id.* The Circuit explained the contours of such a challenge in *Argo v. Blue Cross and Blue Shield of Kan., Inc.*, 452 F.3d 1193 (10th Cir. 2006) ("At the summary judgment state, evidence need not be submitted in a form that would be admissible at trial . . . Nonetheless, the content or substance of the evidence must be admissible.") (citations and internal quotation marks omitted). But the nature of defendant's offer of the challenged statements nullifies plaintiff's hearsay objection. Defendant offered the statements not to prove the truth of the matters they assert. Instead, defendant offered the statements to prove that declarants had reported this information and it informed defendant's employment decisions. *See* Doc. 53 at 6–7. The substantive law that governs this case recognizes the theory embraced by defendant's offer of the statements. "'The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair, or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs.'" *Rivera v. City & Cty. of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)). When courts decide whether an employer's proffered reason for a decision was pretextual, the court "'examine[s] the fact as they appear to the person making the decision.'" *Id.* (quoting *Watts v. Norman*, 270 F.3d 1288, 1295 (10th Cir. 2001)).

The court thus overrules plaintiff's objection because defendant does not offer the out-of-court statements to prove the truth of the matters they assert.

[11]     Ms. Augustine testified that plaintiff had shared this information about Principal Garver's call to the suicide hotline and her drug use with L.A. in "a previous conversation," *i.e.*, before their discussion during the pep assembly. Doc. 46-16 at 6 (37:13–24, 38:1–8).

school year, but hadn't complained to Principal Garver about them.  Doc. 46-8 at 20 (Garver

Dep. 93:15–19).  Ms. Augustine reported that in those earlier texts, plaintiff had called L.A.

"daughter," and L.A. had called plaintiff "mom."  *Id.* (Garver Dep. 96:9–20).  During the fall

semester of 2017, Ms. Augustine reported, she had seen texts on L.A.'s phone where plaintiff

had referred to L.A. as "daughter" and told L.A. she loved her.  And, in turn, L.A. had referred to

plaintiff as "mom."  Doc. 46-16 at 3 (Augustine Dep. 26:19–27:1).  Ms. Augustine believed it

was inappropriate for plaintiff and L.A. to refer to one another as "mom" and "daughter."  Ms.

Augustine informed Principal Garver that she expected L.A. to come to her office and apologize

for not being honest about what had occurred in plaintiff's classroom the previous Friday.  Doc.

46-16 at 6 (Augustine Dep. 38:21–39:3).  Ms. Augustine and Principal Garver never discussed

plaintiff's discipline during their meeting.

According to plaintiff, students always called her by her last name, and her 8th grade

students called her "mom."  They called her "mom" so often that when plaintiff encountered

L.A. with her mother, Ms. Augustine, on September 28, 2017, it felt odd when L.A. called her

"Ms. Fisher."  Doc. 46-5 at 44 (Plaintiff Dep. 204:10–16).  Plaintiff didn't think this "mom"

nickname was inappropriate because it was a joke arising from a class lesson she had taught

early in the school year.  She called her students "son," "daughter," "child," and "kid."  *Id.* at 28

(Plaintiff Dep. 126:1–5).  She didn't think these terms were inappropriate because they were

"teacher slang."  *Id.*  She never had heard another teacher call students "sons" or "daughters,"

with the exception of a coach she once heard refer to a student as "son."  But she never heard

students call the coach "dad."  Plaintiff didn't believe that exchanging text messages with her

students was inappropriate.  Also, she didn't believe it was inappropriate to tell L.A. that she

loved her, missed her, and that she was happy to have a close bond with her. *Id.* at 46 (Plaintiff

Dep. 209:12–25).

### Tuesday, January 23, 2018

The next day, Tuesday, January 23, 2018, plaintiff sent a text message to A.M., the high

school student who had been in her classroom during the pep assembly the previous Friday. The

message said, "[a]dmin here may pull you in. We all have the same story. We talked about

those student problems. You gave your input. That was it." Doc. 46-15; Doc. 46-5 at 54

(Plaintiff Dep. 247:4–10). Plaintiff sent a second text message to A.M., saying, "I don't want

them to know I talked to you so make sure you delete texts!!" *Id.* (Plaintiff Dep. 247:11–15).

According to plaintiff, she told A.M. to delete the texts to "try[ ] to save what name [she] had

left." *Id.* (Plaintiff Dep. 247:16–23).

Plaintiff also met that day with Principal Garver and Assistant Principal Baker during 4th

period. They discussed the pep assembly incident. *Id.* at 57 (Plaintiff Dep. 257:3–15). Assistant

Principal Baker told plaintiff she had been "negligen[t]" for not supervising her students at the

pep assembly. *Id.* (Plaintiff Dep. 257:21–24). Plaintiff admitted that the teacher handbook

provided she was responsible for supervising students at the assembly, but that particular

assembly was the first time that administrators had conveyed that it was important for teachers to

attend. *Id.* (Plaintiff Dep. 258:18–25).

Superintendent Howard and Principal Garver also met alone. They discussed the pep

assembly incident and decided to suspend plaintiff, with pay, until the next Board of Education

meeting. Doc. 46-12 at 8 (Howard Dep. 41:10–20). Principal Garver informed Superintendent

Howard that plaintiff "did not need to be a teacher in [her] building" anymore. Doc. 46-8 at 22

(Garver Dep. 106:20–23). Superintendent Howard had planned to recommend that the Board of

Education terminate plaintiff's employment at its February board meeting.  Superintendent Howard informed Ms. Miller—President of the Board of Education—that "they" intended to suspend plaintiff.  Doc. 46-13 at 5 (Miller Dep. 19:1–10).  Defendant suspended plaintiff indefinitely because, during their meeting, Principal Garver had recommended to Superintendent Howard that the Board of Education terminate plaintiff's employment.  Doc. 46-8 at 22 (Garver Dep. 108:18–22).  According to Superintendent Howard, the pep assembly incident drove the termination decision.  Doc. 46-12 at 13 (Howard Dep. 70:1–3).  Principal Garver, he asserted, never expressed concern in January 2018 about plaintiff's mental or emotional capacity to perform as a teacher.  Id. (Howard Dep. 69:1–8).  And according to Principal Garver, between November 30, 2017 and January 23, 2018, nothing suggested plaintiff had suicidal ideation.  She had not experienced any panic attacks at school, and Principal Garver received no communication from plaintiff indicating that she was in "crisis" or seeking counseling.  Doc. 46-8 at 26 (Garver Dep. 125:7–17).

Superintendent Howard concluded plaintiff had violated Board Policy GAF.  It provides, in part, that "staff members shall maintain professional relationships with students which are conducive to an effective educational environment."  Doc. 46-12 at 13 (Howard Dep. 71:9–23).  Superintendent Howard believed plaintiff's absence from the pep assembly was inexcusable because she had a classroom of students who has attended the pep assembly unsupervised.  Id. at 8 (Howard Dep. 44:2–14).

Principal Garver gave plaintiff a document outlining her "neglect of her teacher responsibilities."  Doc. 46-8 at 18 (Garver Dep. 86:6–10).  One of the reasons Principal Garver identified in this document was "carrying on conversations with middle school students about [her] personal life."  Id. at 19 (Garver Dep. 89:10–22).  According to Principal Garver, plaintiff

had "exceeded the boundaries of a teacher/student relationship." *Id.* at 21 (Garver Dep. 97:6–9).

Principal Garver believed plaintiff had failed to do what her contract stated, and "therefore [she]

should not be retained as a teacher in the classroom." *Id.* at 23 (Garver Dep. 113:8–13).

Superintendent Howard and Principal Garver secured a long-term substitute teacher for

plaintiff's class.

Later that day, Superintendent Howard notified plaintiff, in writing, of her suspension,

pending the Board of Education's next meeting.  Plaintiff assumed the suspension was because

of the pep assembly incident.  She told "other people" that the Board of Education might

terminate her employment at its next meeting.  Doc. 46-5 at 36 (Plaintiff Dep. 166:11–13).

### *Plaintiff's EEOC Charge and Termination*

After her suspension, plaintiff sought legal counsel.  She then filed a complaint with the

EEOC.  She never complained to Superintendent Howard about discrimination based on her

disability before filing her EEOC complaint.  Nor did she complain to district administrators or

the Board of Education about discrimination based on her disability.  Plaintiff talked with a

union representative, but the representative never informed her she could file a grievance under

the union contract.  She also talked to mentors, who taught school in other school districts.  They

informed her that school districts typically afford teachers a process for filing discrimination

complaints.  Plaintiff knew about defendant's grievance procedure because she had read the

faculty handbook and the union contract, but never filed a grievance.  Plaintiff had reviewed

defendant's faculty handbook and defendant's policies, which gave her the opportunity to file a

complaint about disability discrimination.  Plaintiff never filed a disability discrimination

complaint under defendant's grievance policy.

On February 2, 2018, Superintendent Howard received a letter, with a copy of plaintiff's EEOC complaint, from plaintiff's counsel. In his correspondence, plaintiff's counsel notified defendant of plaintiff's concerns about discrimination and retaliation. Doc. 50-1 at 4 (Plaintiff Decl. ¶ 12); Doc. 50-2 at 5–6. Counsel's letter "invite[d] an interactive process designed to accommodate" plaintiff's employment. Doc. 50-2 at 5. Around February 8, 2018, Superintendent Howard received notice from the EEOC that plaintiff had filed a charge of discrimination. After receiving the EEOC Charge, Superintendent Howard decided he would not recommend termination at the Board's February 2018 meeting. But the Board discussed the EEOC complaint during the February meeting. It decided to mediate with plaintiff through the EEOC-sponsored mediation program. A mediation session with plaintiff occurred on March 1, 2018, but the parties failed to reach an agreement. Doc. 50-1 at 4 (Plaintiff Decl. ¶ 13).

The Board of Education took the "first step" toward terminating plaintiff's employment at its March 12, 2018 meeting. Doc. 46-12 at 10–11 (Howard Dep. 52:24–25-53:1–8). Namely, the Board unanimously passed a "Resolution of Intent to Terminate" plaintiff's teaching contract. *See* Doc. 46-18 at 2. Plaintiff received notice of the Board's resolution around March 14, 2018. Then, during its April 9, 2018 meeting, the Board formally terminated plaintiff's teaching contract. Plaintiff didn't attend either Board meeting. On April 17, 2018, plaintiff filed an Amended Charge of Discrimination with the EEOC. *See* Doc. 46-21 at 3–4.

### *Defendant's Discipline of Other Employees*

In September 2015, defendant suspended teacher Molly Bovos for four days for slapping a student. Doc. 50-7 at 14–15 (Miller Dep. 44:4–13; 47:1). Defendant did not terminate her employment. Defendant also suspended teacher Curtis Westbrook for five days in April 2016 for kicking a student in the foot. *Id.* at 15 (Miller Dep. 47:2–11). According to Dayna Miller,

President of the Board of Education, both of these misconduct issues were one-time incidents. *Id.* at 14 (Miller Dep. 48:3–15). In April 2018, defendant suspended Larry Booth for four days for inappropriately touching a student's leg during track practice. Doc. 50-6 at 18 (Howard Dep. 58:1–25, 59:1–4). Mr. Booth had no other disciplinary issues during his 30 years of employment with defendant. *Id.* (Howard Dep. 60:2–3). In January 2017, defendant reprimanded teacher Debby King for bullying behavior toward students. Doc. 50-12 at 26; Doc. 50-6 at 18 (Howard Dep. 57:23–58:2). Defendant reprimanded two of these four teachers for bullying, which Superintendent Howard considers "serious transgressions." Doc. 50-6 at 18 (Howard Dep. 60:17–23). He testified that bullying behavior by a teacher possibly could be considered immoral or unethical. *Id.* at 18–19 (Howard Dep. 60:24–61:2). As far as Superintendent Howard knew, none of these four teachers were disabled under the ADA. And none of them had raised concerns with defendant about discrimination or retaliation before defendant disciplined them.

## II.     Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also In re Aluminum Phosphide Antitrust Litig.*, 905 F. Supp. 1457, 1460 (D. Kan. 1995). When it applies this standard, the court "view[s] the evidence and make[s] inferences in the light most favorable to the non-movant." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986)); *see also In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1150 (D. Kan. 2012) (explaining that "[a]n issue of fact is 'genuine' if 'the evidence allows a reasonable jury to resolve the issue either way.'" (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006)), *overruled on other grounds by Bertsch v. Overstock.com*, 684 F.3d 1023, 1029 (10th Cir. 2012). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Nahno-Lopez*, 625 F.3d at 1283 (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)); *see also In re Urethane Antitrust Litig.*, 913 F. Supp. 2d at 1150 (explaining that "a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim." (citation omitted)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*,

477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be

identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated

therein."  *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d

1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)).

Finally, federal courts do not view summary judgment as a "disfavored procedural

shortcut."  *Celotex*, 477 U.S. at 327.  Instead, it is an important procedure "designed 'to secure

the just, speedy and inexpensive determination of every action.'"  *Id.* (quoting Fed. R. Civ. P. 1).

### III.    Analysis

Plaintiff asserts claims for (1) disability discrimination, violating 42 U.S.C.

§ 12112(d)(4)(A) and § 12112(a), and (2) retaliation, violating 42 U.S.C. § 12203(a).  Doc. 41 at

5.  The court's analysis begins by addressing plaintiff's claim of an improper disability-related

inquiry under 42 U.S.C. § 12112(d)(4)(A).  The court then addresses plaintiff's disability

discrimination claim under § 12112(a).  Finally, the court addresses plaintiff's retaliation claim

under § 12203(a).

### A.  Disability Discrimination under 42 U.S.C. § 12112(d)(4)(A)

#### 1.  Disability-Related Inquiry under the ADA

The ADA prohibits an employer from "mak[ing] inquiries of an employee as to whether

such employee is an individual with a disability or as to the nature or severity of the disability,

unless such . . . inquiry is shown to be job-related and consistent with business necessity."  42

U.S.C. § 12112(d)(4)(A).  "A plaintiff asserting a claim under § 12112(d)(4)(A) must show (1)

that he is an employee of the defendant-employer, and (2) that the defendant-employer required

him to undergo a medical examination or made a disability-related inquiry of him."  *Williams v.*

*FedEx Corp. Servs.*, 849 F.3d 889, 901 (10th Cir. 2017) (citing *Roe v. Cheyenne Mountain*

*Conference Resort, Inc.*, 124 F.3d 1221, 1229 (10th Cir. 1997)).  But, "the employer may avoid liability by demonstrating that the medical examination or disability-related inquiry was job-related and consistent with business necessity." *Id.* (citing 42 U.S.C. § 12112(d)(4)(A)).  This provision applies to all employees and does not require a plaintiff to prove she has a disability within the meaning of the ADA.  *Id.* (citing *Roe*, 124 F.3d at 1229).

Plaintiff asserts that a triable issue exists whether defendant made an "improper medical inquiry" of plaintiff under this provision of the ADA.[12]  Doc. 50 at 16–21.  Specifically, plaintiff contends, Principal Garver's question—asking how plaintiff's psychiatrist appointment had gone—during their November 30, 2017 meeting was an improper medical inquiry.  *Id.* at 16.  Plaintiff's argument warrants careful analysis of this provision in the ADA.

"The ADA does not forbid all medical inquiries . . . ."  *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 95 (2d Cir. 2003).  Instead, it prohibits medical examinations and inquiries inquiring whether an "'employee is an individual with a disability or as to the nature or severity of the disability.'"  *Id.* (quoting 42 U.S.C. § 12112(d)(4)(A).  "In other words, the ADA prohibits two separate and distinct things:  (1) medical examinations; and (2) disability-related inquiries."  *Roe v. Cheyenne Mountain Conference Resort*, 920 F. Supp. 1153, 1154 (D. Colo. 1996), *aff'd in pertinent part*, 124 F.3d at 1230, 1231 n.6.  Because no evidence in the summary judgment record suggests defendant subjected plaintiff to any kind of medical examination, the court construes plaintiff's allegation of an "improper medical inquiry" as an allegation that

---

[12]     Defendant asserts, in a footnote, that plaintiff has waived ADA discrimination claims under § 12112(d) because she has only asserted claims for disability discrimination under § 12112(a) and retaliation under § 12003(a).  The Pretrial Order preserves a claim for disability discrimination, as reflected in Count I of plaintiff's Complaint (Doc. 1-1).  Doc. 41 at 5.  The Complaint asserts a claim for disability discrimination under 42 U.S.C. § 12101 *et seq.*, and never specifies that plaintiff limits her claim to violations of § 12112(a).  The Pretrial Order and Complaint thus are broad enough to embrace plaintiff's claim under § 12112(d)(4).

defendant made a disability-related inquiry under § 12112(d)(4)(A).  The question, then, is whether Principal Garver's question about plaintiff's psychiatrist appointment qualifies as a disability-related inquiry under the ADA.

As one would expect, defendant contends that it doesn't.  Defendant asserts that plaintiff's argument simply assumes Principal Garver's question about plaintiff's psychiatrist appointment was asking about a disability.  Doc. 53 at 27.  According to defendant, the evidence won't support this assumption.  *Id.*  Defendant asserts that the summary judgment record shows two events prompted Principal Garver to inquire about plaintiff's psychiatrist appointment:  (1) plaintiff's panic attack in her classroom on November 16, 2017, and (2) plaintiff's text messages to Principal Garver asking for the school social worker's contact information and referencing suicide and depression.  *Id.*  According to defendant, the death of plaintiff's former high school classmate triggered these events, not a disability.  *Id.*  So, defendant argues, no admissible evidence supports plaintiff "assum[ing] any inquiry into a psychiatric appointment [was] disability-related."  *Id.*  Plaintiff responds—as one would expect—that a genuine issue of material fact exists whether Principal Garver's question was disability-related.

On the question of what inquiries qualify as disability-related inquiries under the ADA, Tenth Circuit caselaw is sparse, so the court has searched more broadly.  In *Roe v. Cheyenne Mountain Conference Resort*, the Tenth Circuit affirmed the district court's conclusion that an employer's policy requiring employees to disclose their prescription drug medications violated the ADA because, in effect, it forced employees to reveal their disabilities.  *Roe*, 920 F. Supp. at 1154, *aff'd in pertinent part*, 124 F.3d at 1230, 1231 n.6.  Similarly, the Second Circuit—citing *Roe v. Cheyenne Mountain Conference Resort*—concluded that requiring employees to provide a "general diagnosis" as part of medical certification policy following certain absences triggered

ADA protection because it "may tend to reveal a disability." *Conroy*, 333 F.3d at 95–96.  But

the Sixth Circuit concluded in *Lee v. City of Columbus, Ohio* that an employer asking an

employee returning to work about the nature of his illness is not necessarily a question about

whether the employee is disabled.  636 F.3d 245, 254–55 (6th Cir. 2011).  In *Lee*, the Sixth

Circuit reasoned that the Second Circuit's holding in *Conroy*—*i.e.*, that the ADA prohibits any

inquiry that "may tend to reveal" an employee's disability—"unnecessarily swept within the

statute's prohibition numerous legitimate and innocuous inquiries that are not aimed at

identifying a disability."  *Id.* at 254.

EEOC Enforcement Guidance also provides useful parameters on permissible questions

under the ADA.[13]  Under EEOC Guidance, disability-related inquiries may include questions

asking whether an employee has a disability, asking her about the severity of her disability,

asking her to provide documentation about her disability, asking whether she is taking any

prescription drugs or medications, and asking broad questions about impairments likely to elicit

information about a disability.  Questions such as "[w]hat impairments do you have?" could

qualify as disability-related.  *Id.*  On the other hand, the Guidance reasons, questions not likely to

elicit information about a disability do not qualify as disability-related inquiries.  The EEOC's

Guidance notes that permissible questions include general questions about an employee's well-

---

[13]     *Enforcement Guidance:  Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)*, EEOC (July 27, 2000), https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees#5.

Courts may consider EEOC Interpretive Guidance when analyzing ADA issues, but it "does not carry the force of law and is not entitled to any special deference . . . ."  *Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 899 n.3 (10th Cir. 1997).

being, whether she can perform her job functions, and asking about nondisability-related

impairments, *e.g.*, a broken leg. *Id.*

Here, Principal Garver asked plaintiff a general question asking how her appointment

with her psychiatrist had gone. She never inquired about a disability or diagnosis. She never

asked plaintiff to provide any information about her treatment or medications. She never

required plaintiff to provide any information about her health or putative disability. Principal

Garver's question was far less pointed—and thus less likely to elicit information about a

disability—than the inquiry in *Roe v. Cheyenne Mountain Conference Resort* (soliciting

information about the employee's prescription medication), *Conroy* (requiring employee to

provide a "general diagnosis" after certain absences), or *Lee* (requiring employee to provide

information about the nature of their illness). Indeed, Principal Garver's question resembled a

general question about plaintiff's well-being and not a question seeking information about a

disability.

But here, the controlling question is narrower. Under these standards, could a reasonable

jury find that Principal Garver's question forced plaintiff to reveal a disability or share a "general

diagnosis" that tended to reveal a disability? In the end, the court decides that it need not answer

that question. Even if the court assumes Principal Garver's question was disability-related, it

still represented an inquiry that the ADA permits. Part 2, following, explains why.

### 2.  Job-Related and Consistent with Business Necessity

"An employer is liable for an improper [disability-related] inquiry, 'unless

such . . . inquiry is shown to be job-related and consistent with business necessity.'" *Williams*,

849 F.3d at 902 (quoting 42 U.S.C. § 12112(d)(4)(A)). The Second Circuit has held that the

phrase "business necessity" means "vital to the business," not merely "convenient or

beneficial."[14]  *Conroy*, 333 F.3d at 97; *see also Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir. 2001) (holding that a business necessity must "substantially promote the business' needs" (internal quotation marks and citation omitted)).  "[B]usiness necessities may include ensuring that the workplace is safe and secure or cutting down on egregious absenteeism."  *Conroy*, 333 F.3d at 97–98.  The employer also must show that the "inquiry genuinely serves the asserted business necessity and that the request is no broader or more intrusive than necessary."  *Id.* at 98.  The employer need not show the inquiry was the only way of achieving a business necessity.  *Id.* But it "must be a reasonably effective method of achieving the employer's goal."  *Id.*

The Tenth Circuit has recognized that "'courts will readily find a business necessity if an employer can demonstrate that [an inquiry] is necessary to determine whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties.'"  *Adair v. City of Muskogee*, 823 F.3d 1297, 1312 (10th Cir. 2016) (quoting *Conroy*, 333 F.3d at 98).  As the Second Circuit noted in *Conroy*, courts generally have addressed this issue in cases where employers sought a medical exam from an employee who had severe attendance problems, or had otherwise demonstrated an inability to perform required job functions.  333 F.3d at 98; *see, e.g.*, *Porter v. U.S. Alumoweld Co., Inc.*, 125 F.3d 243, 245–46 (4th Cir. 1997) (finding consistent with business necessity were employer required a medical exam from employee— whose job required lifting—when employee returned to work following leave of absence for injury).

---

[14]     Although *Conroy* is a Second Circuit decision, the Tenth Circuit has cited the case in two recent cases:  *Adair v. City of Muskogee*, 823 F.3d 1297 (10th Cir. 2016) and *Williams v. FedEx Corp. Serv.*, 849 F.3d 889 (10th Cir. 2017).  The court thus considers *Conroy* persuasive authority on the question whether Principal Garver's question to plaintiff about her psychiatrist appointment qualified as job-related and consistent with business necessity.

Plaintiff asserts that Principal Garver's question does not qualify as "job-related or consistent with business necessity" under the ADA.  Doc. 50 at 18–21.  Plaintiff directs the court to EEOC Enforcement Guidance, providing that a disability-related inquiry of an employee may be "job-related and consistent with business necessity when an employer has a reasonable belief, based on objective evidence, that:  (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat due to a medical condition."[15]  The EEOC Guidance explains that this standard may be met when an employer has observed symptoms "indicating that an employee may have a medical condition that will impair his/her ability to perform essential job functions or will pose a direct threat."  *Id.*

Plaintiff asserts, first, that Principal Garver's question wasn't job-related because no "proper degree of linkage" existed between Principal Garver's question about plaintiff's psychiatrist appointment and her job.  Doc. 50 at 18.  Principal Garver's question about the psychiatrist appointment, she contends, never "dr[ew] upon [plaintiff's] school duties."  *Id.*  For the inquiry to qualify as job-related, plaintiff reasons, Principal Garver must have incorporated a school-related issue, such as whether plaintiff and her health professional were "of the view that [she] could supervise [her] students this next week?"  *Id.*  Second, plaintiff asserts, she never posed a "direct threat to her workplace."  No evidence suggests, plaintiff argues, that she had violent tendencies, or that her job required her to handle objects or machinery that could pose a danger to herself or others.  *Id.* at 19.

---

[15]     *Enforcement Guidance:  Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)*, EEOC (July 27, 2000), https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees#5 (internal quotation marks omitted).

Defendant disagrees.  It asserts that Principal Garver's question about plaintiff's psychiatrist appointment was appropriately job-related and consistent with business necessity. Plaintiff's job required her to teach and supervise middle school students.  Doc. 53 at 28. Plaintiff had experienced a panic attack in her classroom, had sent Principal Garver a text message referencing suicide and depression, and had met with Assistant Principal Baker about an incident where a student sustained a head injury in her classroom.  *Id.*  These events, defendant contends, entitled Principal Garver to ask about plaintiff's psychiatrist appointment because she needed to ensure the "well-being of students."  *Id.*

The court agrees with defendant.  Even construing Principal Garver's question as a disability-related inquiry, a reasonable factfinder only could find that her inquiry was job-related and consistent with business necessity.  As principal, Principal Garver was responsible for ensuring teachers could teach and supervise students effectively.  In this context, her question about plaintiff's psychiatrist appointment sought information about plaintiff's ability to perform the essential functions of her job:  teaching and supervising students.  And, as defendant points out, plaintiff's behavior in the previous two weeks warranted Principal Garver's inquiry. Plaintiff had a panic attack in her classroom, rendering her unable to supervise her students.  This incident alone gave Principal Garver a legitimate, nondiscriminatory reason to question plaintiff's capacity to perform her job duties.  *See Adair*, 823 F.3d at 1312 ("'[C]ourts will readily find a business necessity if an employer can demonstrate that a[n]. . . inquiry is necessary to determine . . . whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties.'" (quoting *Conroy*, 333 F.3d at 98 (second ellipses in original))).  Given the undisputed facts that plaintiff had suffered a panic attack in her classroom shortly before the

inquiry, she had sent Principal Garver a text message referencing suicide and depression, and a student had sustained a head injury in plaintiff's classroom while under her supervision, Principal Garver had compelling reasons to inquire about plaintiff's ability to perform her job.

The court thus concludes the uncontroverted facts establish that Principal Garver's inquiry—to the extent construed as a disability-related inquiry—was job-related and consistent with business necessity. *See Conroy*, 333 F.3d at 97 (holding that business necessities include making sure the workplace is safe and secure, and that the inquiry must be a "reasonably effective method of achieving the employer's goal"). The court thus grants defendant summary judgment against plaintiff's discrimination claim premised on an improper disability-related inquiry under § 12112(d)(4)(A).

### B. Disability Discrimination under 42 U.S.C. § 12112(a)

"The ADA prohibits an employer from discriminating 'against a qualified individual with a disability because of the disability . . . .'" *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting 42 U.S.C. § 12112(a)). In cases involving general discrimination claims, the Tenth Circuit applies the burden-shifting framework first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997). To establish a prima facie case of discrimination, an ADA plaintiff must show that: "'(1) that he is disabled within the meaning of the ADA, (2) that he is qualified—with or without reasonable accommodation; and (3) that he was discriminated against because of his disability.'" *Butler v. City of Prairie Vill., Kan.*, 172 F.3d 736, 748 (10th Cir. 1999) (quoting *Siemon v. AT&T Corp.*, 117 F.3d 1173, 1175 (10th Cir. 1997) (internal quotation marks omitted)). Plaintiff's burden at this stage is "'not onerous.'" *Carter v. Pathfinder Energy Servs.*,

*Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011) (quoting *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005)).

If the plaintiff can establish a prima facie case, the burden then shifts to defendant to "proffer a legitimate, nondiscriminatory reason for the adverse employment action." *Den Hartog*, 129 F.3d at 1085 (citing *McDonnell Douglas*, 411 U.S. at 802). "If defendant articulates a nondiscriminatory reason, the burden shifts back to plaintiff to show a genuine issue of material fact as to whether the defendant's reason for the adverse employment action is pretextual." *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1220 (10th Cir. 2016).

### 1.   Prima Facie Case

The court addresses each element of plaintiff's prima facie case, in turn, below.

### a.   Whether plaintiff is disabled under the ADA

To satisfy the first element of her prima facie case, plaintiff must show that she is disabled within the meaning of the ADA. *Smothers v. Solvay Chems. Inc.*, 740 F.3d 530, 544 (10th Cir. 2014). Defendant asserts that plaintiff has failed her burden on this first element. Doc. 46 at 42. Defendant doesn't dispute, for purposes of this motion, that plaintiff has PTSD. *Id.* And, defendant acknowledges, a PTSD diagnosis could qualify as a mental impairment under the ADA. *Id.* But, defendant contends, plaintiff hasn't met her burden to adduce admissible evidence that her PTSD substantially limits a major life activity. *Id.* at 43. So, defendant argues, plaintiff cannot establish the first element of her prima facie case. *Id.* Plaintiff disagrees. She asserts that her PTSD condition "substantially limits her life activities of sleeping or concentrating" and that she has adduced sufficient evidence of this limitation to satisfy this element of her prima facie case. Doc. 50 at 21.

The ADA defines "disability" as an individual with (A) "a physical or mental impairment that substantially limits one or more major life activities . . ."; (B) "a record of such an impairment;" or (C) "being regarded as having such an impairment . . . ."  42 U.S.C. § 12102(1). Plaintiff claims that she has a disability falling within the first of these three definitions—*i.e.*, an impairment that substantially limits one or more major life activities.  Doc. 50 at 21.  This standard requires the court to consider:  (1) whether plaintiff's PTSD is an impairment, (2) whether the life activity relied on by plaintiff qualifies as a "major life activity" under the ADA, and (3) whether the impairment substantially limits the identified "major life activity." *MacKenzie v. City and Cty. of Denver*, 414 F.3d 1266, 1275 (10th Cir. 2005), *abrogated on other grounds by Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166 (10th Cir. 2018).  Whether a claimed disability qualifies as an impairment under the ADA and whether the identified endeavor is a major life activity are questions of law for the court to decide.  *Id.*  But "whether the impairment substantially limits the major life activity is a factual question for the jury."  *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003).

Our Circuit has recognized that PTSD qualifies as an impairment under the ADA.  *See Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1118 (10th Cir. 2004) (analyzing claim that employer failed to accommodate employee's PTSD).  Here, plaintiff testified by affidavit that her PTSD causes her various symptoms impairing her daily life activities.  These impairments include sleeping and concentrating.  Doc. 50-1 at 2 (Plaintiff Decl. ¶ 2).  "A 'major life activity' is a basic activity that the average person in the general population can perform with little or no difficulty."  *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999).  Sleeping and concentrating qualify as major life activities under the ADA.  42 U.S.C. § 12102(2)(A).

The final question in this analysis asks whether plaintiff's PTSD "substantially limits" her major life activities at issue here, *i.e.*, sleeping and concentrating. *MacKenzie*, 414 F.3d at 1275. Plaintiff testified by affidavit that she experiences "chronic and incapacitating sleeplessness" and that she experiences stress, anxiety, elevated heart rate, shortness of breath, panic attacks, nightmares, and insomnia that impair her sleep and concentration. Doc. 50-1 at 2 (Plaintiff Decl. ¶ 2). Her psychiatrist, Dr. Kevin Mays, testified that he began treating plaintiff on November 29, 2017. Doc. 50-11 at 4 (Mays Dep.). He testified that plaintiff's PTSD symptoms "negatively affect her sleep" and that he thus has prescribed her medication. Doc. 50-11 at 17 (Mays Dep.). Because plaintiff has alleged that she experiences chronic sleeplessness, and has adduced evidence that a psychiatrist has treated her for this symptom, the court concludes that plaintiff has carried her summary judgment burden on this element of her prima facie case.

### b. Whether plaintiff is qualified to perform the essential functions of her job

Next, defendant asserts, plaintiff cannot satisfy the second element of her prima facie case because she was not qualified to perform the essential functions of her job. Doc. 46 at 43–44. Plaintiff responds that she was qualified for her teaching position because she possessed a Kansas teaching license. Doc. 50 at 22 (citing *Brown v. Unified Sch. Dist. No. 501*, No. 2:17-cv-02390-HLT, 2019 WL 3318183 (D. Kan. July 24, 2019)). Defendant responds, arguing that merely holding a teaching certificate isn't enough. Doc. 46 at 44. Defendant contends that plaintiff must also demonstrate "that she was meeting her employer's legitimate business expectations" to be considered qualified for her position. *Id.* (citing *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir. 2009)). Defendant contends that because plaintiff "had repeated,

documented, problems with classroom management and boundary issues," she cannot meet her burden on this element of the prima facie case. *Id.*

Plaintiff bears the burden of showing she can perform the essential functions of her job, with or without reasonable accommodation. *Hennagir v. Utah Dep't of Corrs.*, 587 F.3d 1255, 1262 (10th Cir. 2009). "A job function is 'essential' if it is fundamental to a position and all employees in the position must perform it." *Koessel v. Sublette Cty. Sheriff's Dep't*, 717 F.3d 736, 743 (10th Cir. 2013) (quoting *Hennagir*, 587 F.3d at 1262). Plaintiff relies on *Brown*, a recent case in this district where Judge Teeter held that the plaintiff, who had applied for a substitute teaching position, had carried his burden on this part of his prima facie case because he met defendant's requirements for employment by possessing a current teaching certificate. 2019 WL 3318183, at *6. Defendant invokes *Lloyd*, a Seventh Circuit case, which includes as an element of the prima facie case that the plaintiff must show "he was meeting his employer's legitimate business expectations." 552 F.3d at 601 (requiring, to establish prima facie case, that plaintiff show (1) he is disabled under the ADA, (2) he was meeting his employer's legitimate business expectations, (3) he sustained an adverse employment action, and (4) similarly situated employees without a disability were treated more favorably).

But Tenth Circuit precedent does not require an ADA plaintiff to show she was meeting her employer's legitimate business expectations to make her prima facie case. *Smothers*, 740 F.3d at 544. Instead, to carry her burden at this stage, plaintiff must show only that she "is qualified to perform the essential functions of her job with or without accommodations." *Id.* The parties do not dispute that plaintiff was qualified objectively—*i.e.*, she possessed a Kansas teaching license—to perform the essential functions of her job. *See Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003) (reversing district court's decision that plaintiff had

failed to show prima facie case of discrimination because plaintiff had shown he was qualified to perform the fundamental duties of the job, which are determined by factors such as job description and whether the employer requires all employees in the position to satisfy the requirement).  The court holds plaintiff has satisfied this element of her prima facie case by presenting evidence supporting a jury finding that she was qualified to perform the essential functions of her job.  Defendant's argument that plaintiff failed to meet its legitimate employment expectations because of her classroom management and boundary issues is more appropriately considered under the pretext analysis, discussed in Part III.B.3., below.

### c. Whether defendant subjected plaintiff to adverse employment action because of her disability

This third and final element of the prima facie case requires plaintiff to adduce evidence that defendant discriminated against her because of her disability.  *E.E.O.C. v. C.R. Eng., Inc.*, 644 F.3d 1028, 1038 (10th Cir. 2011).  To demonstrate discrimination, a plaintiff generally must show that she has sustained "an 'adverse employment action because of the disability.'"  *Id.*, 644 F.3d at 1038 (quoting *Mathews v. Denver Post*, 263 F.3d 1164, 1167 (10th Cir. 2001)); *see also Butler*, 172 F.3d at 748 (the third element of the prima facie case requires plaintiff to "come forth with evidence showing that the adverse employment decision was because of his disability").

The Pretrial Order references "unwarranted discipline," "unlawful suspension," and "termination from her teaching position" as the basis for plaintiff's discrimination claim.  Doc. 41 at 3–4 (Pretrial Order ¶ 3(a)).  Plaintiff's papers never specify, at least not explicitly, the acts amounting to "unwarranted discipline."  Defendant assumes that plaintiff's ADA discrimination claim relies on the following actions to satisfy the "adverse employment action" requirement: (1) the "informal conference" between plaintiff and Assistant Principal Baker after a student sustained a head injury in plaintiff's classroom; (2) the two-day suspension on January 17-18,

2018, and (3) the January 23, 2018 suspension leading ultimately to defendant terminating plaintiff's employment.  Doc. 46 at 46.

Plaintiff's Opposition mentions that that plaintiff "was suspended, and ultimately terminated" (Doc. 50 at 24), but never discusses the meeting with Assistant Principal Baker about the student's head injury (*id.* at 23–25).  Suspension and termination qualify as adverse employment actions.  *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (conduct is adverse employment action when it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").  But an informal reprimand generally does not qualify as an adverse employment action.  *See Medina v. Income Support Div., New Mexico*, 413 F.3d 1131, 1137 (10th Cir. 2005) (holding that warning letters and reprimands will constitute an adverse employment action only if they adversely affect the terms and conditions of plaintiff's employment, *e.g.*, by affecting the likelihood of her termination, undermining her current position, or affecting her future employment opportunities).  Because plaintiff makes no argument about the informal reprimand from Assistant Principal Baker—and no evidence suggests it affected the "terms and conditions of her employment"—the court considers only plaintiff's suspensions and termination as adverse employment actions.  *Id.*  For summary judgment purposes, the court assumes without deciding that plaintiff has carried her summary judgment burden on this element of her prima facie case.

### 2.   Defendant's Legitimate, Nondiscriminatory Reasons

If the plaintiff establishes a prima facie case, the burden then shifts to the second stage in the analysis.  It requires the employer to "proffer a legitimate, nondiscriminatory reason for the adverse employment action."  *Den Hartog*, 129 F.3d at 1085 (citing *McDonnell Douglas*, 411

U.S. at 802). "If defendant articulates a nondiscriminatory reason, the burden shifts back to plaintiff to show a genuine issue of material fact as to whether the defendant's reason for the adverse employment action is pretextual." *Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1220 (10th Cir. 2016).

Defendant asserts it has legitimate, nondiscriminatory reasons for each of its adverse employment actions against plaintiff. Doc. 46 at 47–50. *First*, defendant explains, it suspended plaintiff on January 17 and 18, 2018, because an investigation revealed that plaintiff had failed to discipline students for playing an inappropriate game in her classroom. And, during the same incident, defendant asserts, plaintiff had "roasted" a student using inappropriate language in the classroom. Doc. 46 at 48. Because this was not the first time plaintiff had used inappropriate language in the classroom and had problems with classroom management, defendant contends plaintiff's conduct warranted suspension. *Id.*

*Second*, on the day plaintiff returned from her two-day suspension, defendant asserts, she failed to escort and supervise her students during a pep assembly. *Id.* Instead, she remained in her classroom with students who were not scheduled to be in her classroom during that period. *Id.* Defendant contends she then asked those students to lie to administrators about what had occurred. *Id.* Soon after, defendant asserts, it learned that plaintiff had been "crossing boundaries with her students by texting them without their parents' knowledge and calling her students 'daughters' while they referred to her as 'mom.'" *Id.* For all these reasons, Superintendent Howard decided to suspend plaintiff pending action by the Board of Education to terminate her employment on January 23, 2018. *Id.*

The court concludes defendant has carried its burden to articulate legitimate, nondiscriminatory reasons for its adverse employment actions. *See Reeves v. Sanderson*

*Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (holding that defendant's burden at this stage "is one of production, not persuasion," and it need only offer admissible evidence sufficient for the trier of fact to conclude that employee was fired for legitimate, nondiscriminatory reason).

### 3.  Pretext

Defendant has explained that it took adverse employment actions against plaintiff because she (1) had failed to discipline students for playing an inappropriate game, (2) had inappropriately "roasted" a student as part of the same incident, (3) had failed to supervise students during the pep assembly, (4) had remained in her classroom during the assembly with three students, (5) had asked those students to lie to administrators about what had occurred, and (6) had crossed boundaries with students by texting them without their parents' knowledge and called them "daughters" while permitting them to call her "mom."  Articulating these legitimate, nondiscriminatory reasons shifts the burden back to plaintiff to "show a genuine issue of material fact as to whether" defendant's articulated reason for suspending and terminating her employment was pretextual.  *Kilcrease*, 828 F.3d at 1220.  "A plaintiff can establish pretext by showing the defendant's proffered non-discriminatory explanations for its actions are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief."  *Williams*, 849 F.3d at 900.

Plaintiff asserts that "substantial evidence" of pretext exists.  Doc. 50 at 25.  She focuses her argument on defendant's treatment of plaintiff compared to employees who were not disabled.  *Id.* at 25–27.  Her argument comports with precedent.  One way a plaintiff may show pretext is with evidence she was "'treated differently from other similarly-situated employees who violated work rules of comparable seriousness.'"  *Dewitt v. Sw. Bell Telephone Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d

1220, 1230 (10th Cir. 2000)).  But, "this assessment must be made by adding up the differences

and similarities in light of all the evidence of pretext to determine whether a plaintiff has created

a fact issue on the matter of pretext."  *Doebele*, 342 F.3d at 1137 (citation omitted).  "Not every

difference in treatment, of course, will establish a discriminatory intent."  *Kendrick*, 220 F.3d at

1232.  "Differences in treatment that are trivial or accidental or explained by a nondiscriminatory

motive will not sustain a claim of pretext."  *Id.* (citation omitted).

Plaintiff asserts that, during the same time period as plaintiff's termination, four

teachers—all lacking protected status under the ADA—were disciplined less harshly than

plaintiff for misconduct.  Doc. 50 at 26.  Namely, defendant suspended Mr. Booth for

inappropriately touching a student during track practice.[16]  Doc. 50-6 at 18 (Howard Dep.).  It

suspended Ms. King for "bullying behavior."  *Id.*; Doc. 50-12 at 26.  Superintendent Howard

considered bullying a "serious transgression" and potentially unethical behavior.  Doc. 50-6 at

18.  Both Mr. Westbrook and Ms. Bovos had physical altercations with students resulting in

suspension.  Mr. Westbrook kicked a student in the foot and Ms. Bovos slapped a student in the

face.[17]  Doc. 50-7 at 14–15 (Miller Dep.).

Plaintiff asserts that, for these four teachers, defendant imposed "far less stringent

punishment for behaviors which plainly exceeded" the seriousness of plaintiff's conduct.  Doc.

50 at 27.  Plaintiff asserts that she never bullied or physically assaulted her students.  *Id.*  Instead,

---

[16]     Superintendent Howard recalled that Mr. Booth had been teaching hurdling techniques to a female middle school student during track practice, and she later reported to her parents that she felt uncomfortable with where he had placed his hand on her leg.  Doc. 50-6 at 18 (Howard Dep. 58:19–59:2).

[17]     Plaintiff emphasizes that defendant never considered these four teachers for termination.  Plaintiff is correct that defendant suspended these four teachers and did not terminate their employment.  But no evidence in the summary judgment record shows whether defendant *considered* terminating their employment.  The court thus rejects plaintiff's conclusion that defendant did not consider termination in those situations simply because it decided to suspend them.

"the final act" for which defendant discharged plaintiff was "missing a pep assembly in order to confer with several students of hers who sought her out for discussion purposes." *Id.* Defendant responds that for three teachers—Mr. Booth, Mr. Westbrook, and Ms. Bovos—the misconduct resulting in suspensions were one-time incidents.[18] Doc. 53 at 31. Plaintiff, according to defendant, "had numerous and pervasive issues." *Id.* Defendant asserts that before her termination, plaintiff recently had returned from a suspension when she "immediately engaged in behavior that again called into question her judgment and her ability to supervise and maintain appropriate boundaries with students." Doc. 53 at 31. Defendant asserts it terminated plaintiff's employment because she "failed to perform her duties as a teacher." *Id.*

Plaintiff contends that additional evidence of pretext arises from events occurring shortly before plaintiff's termination. Principal Garver, she asserts, learned of plaintiff's PTSD on November 16, 2017, when she accompanied plaintiff to an urgent care provider. She then "directed plaintiff to take a mental-health based absence the following day as a reasonable accommodation." Doc. 50 at 27. Then, plaintiff contends, Principal Garver "claims she assumed plaintiff . . . was speaking about herself when she sought information for suicide resources" and then "unilaterally decided to contact" the suicide hotline. *Id.* at 27–28. Principal Garver then asked her how her psychiatrist appointment had gone on November 30, 2017. Plaintiff asserts that Principal Garver's actions "are wholly inconsistent with a non-biased approach to management, and as such substantiate a finding of pretext." Doc. 50 at 28. Defendant responds that plaintiff has failed to cite the record to support her factual allegations, and that she has misrepresented the uncontroverted facts. Doc. 53 at 31.

---

[18]     Superintendent Howard didn't remember Ms. King's suspension for "bullying behavior" in January 2017. The summary judgment record contains no other evidence about her suspension. Doc. 50-12 at 26; Doc. 50-6 at 18 (Howard Dep. 57:23–25, 58:1–2).

The court agrees with defendant.  Plaintiff has not shouldered her burden to show a triable issue whether defendant's reasons for its adverse employment actions were pretextual.  At the outset, plaintiff's pretext argument never addresses her initial suspension, for two days, on January 17 and 18, 2018.  This suspension resulted from Principal Garver and Assistant Principal Baker's investigation concluding that students had played an inappropriate game in plaintiff's class—and plaintiff had failed to discipline them when she learned about the game—and that she had "roasted" a student.  To the extent plaintiff contends this suspension constitutes evidence of pretext, the court is unpersuaded.  Plaintiff's argument relies on defendant's decision to suspend four other district teachers for misconduct.  But this discipline is the same discipline defendant imposed on plaintiff.  In other words, plaintiff has presented no evidence suggesting she was "treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Kendrick*, 220 F.3d at 1230.  Plaintiff has thus failed to show a triable issue whether the articulated reasons for her suspension on January 17 and 18, 2018 were pretextual.[19]

The remainder of plaintiff's argument focuses on defendant's decision to terminate her employment.  Doc. 50 at 25–28.  She asserts, in essence, that missing a pep assembly because she was conferring with two middle school students who sought her advice is less serious than inappropriately touching, kicking, slapping, or bullying a student.  Doc. 50 at 27.  And defendant

---

[19]    The court need not decide whether the investigation accurately concluded that plaintiff had failed to discipline students for inappropriate behavior and had "roasted" a student.  The court's inquiry turns on whether Principal Garver and Assistant Principal Baker "honestly believed" their stated reasons for suspending plaintiff "and acted in good faith on that belief." *Dewitt*, 845 F.3d at 1310.  Plaintiff hasn't directed the court to evidence suggesting the two administrators didn't "honestly believe[ ]" she had engaged in misconduct. *See Kendrick*, 220 F.3d at 1231 (concluding no evidence of pretext existed where employee presented no evidence that employer's investigation into misconduct was a sham).

merely suspended the teachers who committed those instances of misconduct.  *Id.*  In contrast, defendant terminated her employment.

The court is unpersuaded that this evidence establishes a triable issue of pretext. Plaintiff's argument ignores the broader context of her termination.  In 2015, Principal Garver had issued plaintiff a disciplinary reprimand when she told her students "this is why I hate this class."  Doc. 46-5 at 41.  Principal Garver then issued plaintiff a written reprimand in April 2016 after she used the word "shit" in front of her students.  Doc. 46-5 at 43 (Plaintiff Dep.).  And, although it doesn't appear Principal Garver imposed formal discipline for this conduct, she also addressed another incident in November 2017 where plaintiff had explained the meaning of the word "gangbanging" to her students.  Doc. 46-8 at 3.  In January 2018, an investigation concluded that plaintiff, in December 2017, had failed to discipline students for playing a game in her classroom involving the word "penis," and that she had inappropriately "roasted" a student by making a comment about the size of the student's penis or suggesting he was playing with his penis.  Doc. 46-8 at 12 (Garver Dep.).  This incident resulted in a two-day suspension.

Then, the day plaintiff returned from that suspension, she failed to supervise her students at a mandatory school pep assembly.  Instead, she remained in her classroom with three students. During the discussion plaintiff conducted with the students while she was supposed to attend the pep assembly, she permitted them to read the letter of reprimand about her suspension and told them about her discipline.  The following Monday, a parent of one of the students who had remained in plaintiff's class room during the pep assembly came to the school and met with Principal Garver.  The parent reported that plaintiff, while in her classroom during the assembly, had shared with her daughter (L.A.) that she had been raped and was attending counseling.  The parent reported that plaintiff had instructed her daughter not to divulge this information to

Principal Garver.  Instead, the parent reported, plaintiff directed the student to tell Principal Garver they were discussing teen problems and friend issues. The parent also reported that in earlier conversations with her daughter, plaintiff had shared that Principal Garver had called the suicide hotline to conduct a welfare check on plaintiff, and that plaintiff had tried drugs.  L.A.'s mother also reported that she had seen text messages on L.A.'s phone where plaintiff and L.A. referred to each other as "mom" and "daughter," and plaintiff told L.A. she loved her.  She believed it was inappropriate for plaintiff to talk to her daughter about rape, suicide, and drugs. And, she believed, it was inappropriate for a teacher and student to call each other "mom" and "daughter."

The next day, January 23, 2017, Principal Garver informed Superintendent Howard that she no longer wanted plaintiff teaching in her building.  Doc. 46-8 at 22 (Garver Dep.). Superintendent Howard suspended plaintiff indefinitely, pending the next Board of Education meeting.  He planned to recommend that the Board terminate plaintiff's employment because, he concluded, she had violated Board Policy GAF.  This policy provides that "staff members shall maintain professional relationships with students which are conducive to an effective educational environment."  Doc. 46-12 at 13 (Howard Dep.).  Principal Garver also provided plaintiff a document outlining her "neglect of her teaching responsibilities."  Doc. 46-8 at 18.  The principal cited plaintiff for "carrying on conversations with middle school students about [her] personal life" as a reason plaintiff had failed to fulfill her duties.  *Id.* at 19.  Principal Garver believed plaintiff had "exceeded the boundaries of a teacher/student relationship" and had failed to fulfill the duties outlined in her teaching contract.  *Id.* at 21.

No reasonable trier of fact plausibly could find that defendant's reasons for terminating plaintiff were pretextual, based solely on the fact that other employees had been suspended—not

terminated—for past misconduct.  When deciding whether plaintiff's claim survives summary

judgment, "the court must determine whether 'plaintiff had adduced enough evidence to support

a finding that the [other employee] and plaintiff were sufficiently similarly situated to support an

inference of discrimination.'"  *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir.

2007) (quoting *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 380 (2d Cir. 2002)).  "Individuals are

considered similarly-situated when they (1) have dealt with the same supervisor; (2) were

subjected to the same work standards; and (3) had engaged in the same conduct without such

differentiating or mitigating circumstances that would distinguish their conduct of the

employer's treatment of them for it."  *Mackenzie*, 414 F.3d at 1277 (internal quotation marks and

citation omitted); *see also Kendrick*, 220 F.3d at 1232 ("An employee is similarly situated to the

plaintiff if the employee deals with the same supervisor and is subject to the same standards

governing performance evaluation and discipline." (citation and internal quotation marks

omitted)).  "A court should also compare the relevant employment circumstances, such as work

history and company policies, applicable to the plaintiff and the intended comparable employees

in determining whether they are similarly situated."  *Aramburu v. Boeing Co.*, 112 F.3d 1398,

1404 (10th Cir. 1997) (citation omitted).

      Applying these standards to the summary judgment facts, the court concludes that

plaintiff hasn't carried her burden to demonstrate a triable issue of pretext.  Plaintiff has adduced

no evidence about the details of Ms. King's "bullying behavior" producing her suspension, so the

court cannot conclude she was similarly situated to plaintiff.  *See Riggs*, 497 F.3d at 1121

(holding that plaintiff had failed to show that employee was similarly situated because "the

record [did] not disclose any details" about the other employee's behavior or the discipline she

received).  In the other three episodes of teacher misconduct—kicking a student's foot, slapping

a student's face, and inappropriately touching a student—the disciplined teachers had one-time misconduct issues.  In contrast, Principal Garver had formally disciplined plaintiff twice—once for telling student she hated the class and once for using inappropriate language—before suspending her for the first time for failing to discipline students and inappropriately "roasting" a student about his penis in front of the class.  The same day plaintiff returned from this suspension, she failed to supervise her students at a pep assembly.  Instead of attending an all-school assembly as directed, she stayed behind in her classroom and shared her letter of reprimand with three students.  And—a parent reported a few days later—plaintiff discussed her own personal issues such as her rape and counseling.  The court holds that the three teachers relied on in plaintiff's pretext argument—who each had one-time incidents of inappropriate physical contact with a student—were not similarly situated to plaintiff.  *See Riggs*, 497 F.3d at 1120–22 (affirming district court's decision granting summary judgment because employees were not similarly situated where "they had not violated workplace rules of comparable seriousness," and no evidence suggested that the employer considered misconduct of other employees to be "as egregious" as plaintiff's misconduct); *see also Salguero v. City of Clovis*, 366 F.3d 1168, 1177 (10th Cir. 2004) (affirming district court's decision granting summary judgment and holding that allegations of disparate discipline were insufficient to show pretext because courts "afford substantial latitude to employers in making discipline related decisions," and there were "significant differences in conduct" among employees);  *Armesto v. Federal Exp. Corp.*, 36 F.3d 1105 (Table), 1994 WL 470184, at *2 (10th Cir. Aug. 31, 1994) (affirming district court's decision granting summary judgment because plaintiff's proposed comparable employees were not similarly situated where plaintiff had more significant history of work performance deficiencies).

Plaintiff has failed to adduce evidence of pretext sufficient to support a triable issue whether defendant's reasons for terminating plaintiff were pretextual.  No reasonable trier of fact could conclude that defendant's suspension of other teachers for isolated incidents undermines its reasons for terminating plaintiff's employment for multiple disciplinary violations identified above.  *See Kendrick*, 220 F.3d at 1233–34 (affirming district court's decision granting summary judgment against discrimination claim, reasoning, in part, that incidents of misconduct were "factually distinguishable" where one employee had physical contact with person he was threatening and the other didn't, because court was "reluctant to require [defendant] to view [the employees'] actions as "equally unacceptable" and explaining that "[a] company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct.").

Plaintiff's argument that Principal Garver's actions—*i.e.*, directing plaintiff to take a day off work for her mental health, assuming plaintiff was talking about herself when she sought information for suicide resources, calling the suicide hotline, and inquiring how plaintiff's psychiatrist appointment had gone—are evidence of pretext also fails to support a triable issue whether defendant's reasons for terminating her employment were pretextual.  For the same reasons discussed above, the uncontroverted facts establish that Principal Garver's actions in response to plaintiff's panic attack at work and text message referencing suicide and depression—to the extent construed as a disability-related inquiry—were job-related and consistent with business necessity.  *See* Part II.A.2, *supra*.  And, plaintiff presents no summary judgment evidence from which a rational factfinder could infer that Principal Garver's actions were pretext for discrimination.

51

In sum, defendant's articulated reasons for terminating plaintiff's employment are not "so incoherent, weak, inconsistent, or contradictory that a rationale factfinder could conclude they are unworthy of belief." *Williams*, 849 F.3d at 900. Plaintiff has failed to carry her summary judgment burden and the court thus grants summary judgment against plaintiff's ADA discrimination claim under § 12112(a).

### C. Retaliation

Finally, plaintiff claims defendant unlawfully retaliated against her because of her disability, violating the ADA. Doc. 41 at 5 (Pretrial Order ¶ 4(a)(ii)); 42 U.S.C. § 12203(a). Defendant asserts it is entitled to summary judgment against this claim. Doc. 46 at 51.

To establish a prima facie case of retaliation under the ADA, plaintiff must show: "(1) protected employee action; (2) adverse action by an employer either after or contemporaneous with the employee's protected action; and (3) a causal connection between the employee's action and the employer's adverse action." *Morgan*, 108 F.3d at 1324. "After establishment of a prima facie case, the burden shifts to the employer to demonstrate a legitimate nondiscriminatory reason for its employment decision." *Id.* at 1323 (citation omitted). "If the employer comes forward with a nondiscriminatory reason for its actions, the burden then reverts to the plaintiff to show that 'there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—*i.e.*, unworthy of belief.'" *Id.* (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

### 1. Prima Facie Case

#### a. Protected Employee Action

The first element of the prima facie case requires plaintiff to have engaged in "protected employee action." *Id.* The parties dispute when plaintiff first engaged in ADA-protected

activity.  According to defendant, plaintiff first engaged in protected activity when she filed her

EEOC Charge around February 1, 2018.  Doc. 46 at 52.  Defendant asserts that this action cannot

support a retaliation claim because the final adverse action plaintiff identifies occurred one week

before—on January 23, 2018—when Superintendent Howard suspended plaintiff pending

termination of her employment by the Board of Education at its next meeting.  *Id.*

Plaintiff responds that defendant is mistaken about which actions qualify as protected

activity and when plaintiff first engaged in protected activity.  Doc. 50 at 28.  According to

plaintiff, she had engaged in protected activity under the ADA by November 30, 2017.  *Id.* at 29.

Plaintiff asserts that, on or before this date, she had disclosed her PTSD to defendant.  Principal

Garver then "specified that [plaintiff] should take a medical day off work in November 2017

following her physician appointment" as a reasonable accommodation, and Principal Garver had

questioned her about her appointment with a psychiatrist.  *Id.* at 28–29.  Plaintiff asserts that

"these factual matters triggered plaintiff['s] [ ] right to be free from ADA-based retaliation . . . ."

*Id.* at 29.

In support, plaintiff cites 42 U.S.C. § 12203(b).  This provision from the ADA provides:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual
> in the exercise or enjoyment of, or on account of his or her having exercised or
> enjoyed, or on account of his or her having aided or encouraged any other individual
> in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C. § 12203(b).  Plaintiff asserts that this subsection "forbids the type of mistreatment

plaintiff sustained" from Principal Garver in November 2017, and "operates to make unlawful

any form of mistreatment by an employer which arises out of an employee's own assertion of

rights to recognition of her condition, reasonable accommodations, and the like."  Doc. 50 at 29.

Plaintiff's argument appears to rely on her purported disclosure of her PTSD condition,

followed by Principal Garver's directive that plaintiff to take a day off work and a later question

about her psychiatrist appointment, as evidence of "a type of mistreatment" arising from plaintiff's protected activity. *Id.* at 28–29. Plaintiff's argument has some flaws.

*First*, the summary judgment record refutes plaintiff's claims that she revealed a PTSD diagnosis to defendant. Indeed, she testified by affidavit that she "declined on one or more occasions to answer any inquiries about medical and/or mental health treatment, examinations and/or [her] medical or mental health history." Doc. 50-1 at 2 (Plaintiff Decl. ¶ 4). The closest she came to disclosing a disability was when a nurse practitioner informed plaintiff—with Principal Garver present in the examination room—that her symptoms "sounded like symptoms of PTSD." Doc. 46-5 at 13 (Fisher Dep.). Even assuming that Principal Garver knew plaintiff had PTSD because of the nurse's comment about plaintiff's symptoms, plaintiff hasn't adduced any evidence that she had engaged in "protected activity" at this point. *See Winston v. Ross*, 725 F. App'x 659, 665 (10th Cir. 2018) (affirming district court's decision granting summary judgment against plaintiff's ADA retaliation claim where employee had disclosed her medical condition to her employer, but hadn't "made a specific request for any accommodation," *i.e.*, engaged in protected activity, before adverse employment action).

*Second*, plaintiff asserts that once Principal Garver learned of her disability, she "specified that [plaintiff] should take a medical leave day off work." Doc. 50 at 29. Plaintiff contends this directive "represented an accommodation for [her] recognized PTSD condition." *Id.* Even assuming plaintiff is correct that this suggestion or directive "represented an accommodation" for plaintiff's disability, plaintiff, at this point, still had not engaged in protected activity under the ADA. "An employee's request that his employer provide him an accommodation for a disability constitutes a protected activity for purposes of advancing an ADA retaliation claim." *Lincoln*, 900 F.3d at 1209; *see also Selenke v. Med. Imaging of Colo.*,

248 F.3d 1249, 1265 (10th Cir. 2001) (holding that plaintiff's request for improvements to employer's ventilation system qualifies as protected activity); *Butler*, 172 F.3d at 749 (considering employee's request for accommodation to work as schedule protected activity). The request for an accommodation must be "'sufficiently direct and specific, giving notice that [the employee] needs a special accommodation.'" *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1188 (10th Cir. 2016) (quoting *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 23 (1st Cir. 2004)).  The employee herself doesn't have to make the request or invoke the "magic words 'reasonable accommodation.'" *Id.* (quoting *C.R. Eng.*, 644 F.3d at 1049).  But the request "must make clear that the employee wants assistance for his or her disability." *Id.*  "And an inadequate request for accommodation—one that does not trigger an employer's duty to provide a reasonable accommodation or participate in the 'interactive process' of finding an appropriate accommodation—can never constitute protected activity." *Id.* (quoting *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171 (10th Cir. 1999)).

Here, plaintiff never asked defendant to provide an accommodation for her disability. She didn't ask Principal Garver for a day off from work or any other kind of accommodation. Nothing in the summary judgment record suggest she requested assistance with a disability. Principal Garver's suggestion—or directive—that plaintiff take a day off work for her mental health is not a "direct and specific" request from plaintiff giving notice that she needs an accommodation for a disability.  *Foster*, 830 F.3d at 1188.  If an employee's "inadequate request for an accommodation . . . can never constitute protected activity," it stands to reason that an employee who makes no request at all can't have engaged in protected activity.  *Id.*  The court concludes that plaintiff didn't engage in protected activity under the ADA until she filed her

EEOC Charge on or around February 2, 2018.  *Id.* at 1187 (holding that filing an EEOC

complaint is an "indisputably protected activit[y]" under the ADA).

### b.  Adverse action by employer after or contemporaneous with the employee's protected action

The second element of the prima facie case requires plaintiff to show "adverse action by

[her] employer either after or contemporaneous with [her] protected action."  *Morgan*, 108 F.3d

at 1324.  Plaintiff returned from her first suspension—resulting from Principal Garver's

conclusion that plaintiff inappropriately had "roasted" a student before the school's winter

break—on Friday, January 19, 2018.  That same afternoon, she permitted three students to

remain in her classroom with her while her class attended the pep assembly, unsupervised by

their teacher.  On January 23, 2018, Superintendent Howard suspended plaintiff indefinitely.

Around February 2, 2018, plaintiff filed her EEOC Charge.  The parties engaged in mediation on

March 1, 2018, but failed to reach an agreement.  On March 12, 2018, the Board of Education

passed a "Resolution of Intent to Terminate" plaintiff's teaching contract.  *See* Doc. 46-18 at 2.

During its next meeting, on April 9, 2018, the Board formally terminated plaintiff's employment.

Doc. 46-5 at 58.  In sum, the first adverse action after plaintiff engaged in activity protected by

the ADA was the Board's Resolution terminating plaintiff's employment.  The Board passed this

resolution on March 12, 2018—some 40 days after plaintiff first had engaged in protected

activity by filing her EEOC Charge.

Defendant asserts that this timeline cannot satisfy the second element of plaintiff's prima

facie case.  It contends that Superintendent Howard already had decided to recommend

termination to the Board of Education when he suspended plaintiff indefinitely.  So, defendant

asserts, it simply was completing the termination process it already had initiated before plaintiff

filed her charge with the EEOC.  Doc. 46 at 53.  Indeed, Principal Garver and Superintendent

Howard both testified that they agreed that Superintendent Howard should recommend termination of employment to the Board of Education on January 23, a week before plaintiff filed her EEOC Charge.  Doc. 46-13 at 5 (Howard Dep.); Doc. 46-8 at 22 (Garver Dep.). Plaintiff responds that defendant never advised plaintiff of her impending termination until March 2018, after the parties' EEOC mediation failed to produce an agreement.  Doc. 50 at 30. According to defendant, however, it simply "delayed taking public action solely as an attempt to see if a settlement could be reached before taking the final steps to formally terminate [plaintiff's] teaching contract."  Doc. 53 at 32.

Trying to support its argument, defendant directs the court to *Morgan*, 108 F.3d at 1324. There, the employee had a pattern of frequent, unscheduled absences from work.  *Id.* at 1322. Her employer warned her that further absences exceeding her allotted sick leave could result in termination.  *Id.*  The employee then filed a charge of disability discrimination with the EEOC. *Id.*  When the employee's unscheduled absences continued, defendant issued several more warnings about her attendance before ultimately terminating her employment.  *Id.*  The Tenth Circuit concluded that the warnings, and ultimately the job termination, all occurring after plaintiff's EEOC Charge failed to support an inference of pretext because they "simply completed the disciplinary process already set in motion."  *Id.* at 1324.

Defendant's reliance on *Morgan* in this part of the analysis is misplaced.  The Tenth Circuit applied *Morgan*'s reasoning when it evaluated the pretext question—not when it decided whether the employee had made a prima facie case of retaliation.  *Id.*  Given the timeline and the facts presented by the summary judgment facts here, plaintiff has satisfied the second element of her prima facie case.  *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999)

(concluding that termination of plaintiff's employment after she filed EEOC complaint satisfied second element of prima facie case).

### c. Causal connection between protected activity and adverse employment action

The final element of the prima facie retaliation case requires plaintiff to show "a casual connection between the employee's action and the employer's adverse action." *Morgan*, 108 F.3d at 1324.  Defendant asserts that no evidence can support plaintiff's allegation that plaintiff's EEOC Charge influenced defendant's decision to terminate plaintiff's employment.  Doc. 46 at 53.  Plaintiff contends that the proximity of her filing an EEOC Charge to her termination— coupled with Principal Garver's actions toward plaintiff in November 2017—is sufficient to establish causation.[20]  Doc. 50 at 30.  Defendant asserts that temporal proximity alone is insufficient to establish causation.  Doc. 46 at 53.

"A retaliatory motive may be inferred when an adverse action closely follows protected activity." *Anderson*, 181 F.3d at 1179 (citing *Chavez v. City or Arvada*, 88 F.3d 861, 866 (10th Cir. 1996)).  The closer the date of an employee's termination to her protected activity, "the more likely it will support a showing of causation." *Id.*  The Tenth Circuit has held that a one and one-half month period—about the same interval here between plaintiff filing her EEOC Charge and her job termination—"may, by itself, establish causation." *Id.* (citing *Ramirez v.*

---

[20]     Plaintiff's Opposition asserts that Principal Garver "victimized" her on multiple occasions in November 2017.  It's not clear which events plaintiff relies on as support for this accusation, but she appears to rely on (1) Principal Garver asking plaintiff how her psychologist appointment went on November 30, and (2) Principal Garver's statement to plaintiff that when her personal life interfered with her job, they needed to talk about it.  Doc. 50 at 30.  Defendant takes issue with plaintiff's characterization of Principal Garver's actions.  Doc. 53 at 32.  It casts Principal Garver's actions during November 2017—*i.e.*, driving plaintiff to the urgent care for medical treatment and calling for a welfare check when she received a cryptic text about suicide and depression—as caring actions intended to ensure plaintiff's safety.  *Id.*  But the court need not resolve this dispute because, based on the timing of plaintiff's filing her EEOC Charge and her termination, the court finds that plaintiff has mustered a prima facie case for her retaliation claim.

*Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994), *overruled on other grounds by Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1194–97 (10th Cir. 1998)).  Because of the timing between plaintiff's protected activity of filing her EEOC complaint and her termination, the court concludes plaintiff has satisfied this element of her prima facie case.

### 2.  Legitimate, Nondiscriminatory Reason and Pretext

Defendant asserts that the same legitimate, non-discriminatory reasons it articulated in response to plaintiff's discrimination claim apply to plaintiff's retaliation claim.  Doc. 46 at 54.  Likewise, to support her retaliation claim, plaintiff incorporates by reference the pretext argument she made to support her discrimination claim.  Doc. 50 at 31.  In other words, she makes no new independent argument supporting her retaliation claim.  The pretext argument supporting her discrimination claim asserted that defendant had disciplined four similarly situated employees less harshly than plaintiff for similar misconduct.  *See* Doc. 50 at 25–28.  But, as the court explained in its analysis of the discrimination claim, this argument failed to identify a triable pretext issue because the other disciplined employees were not similarly situated.  *See* Part III.B.3, *supra*.  For the same reasons, this evidence is insufficient to support a triable issue whether defendant retaliated against plaintiff for filing an EEOC Charge.[21]

---

[21]  Alternatively, defendant asserts it is entitled to summary judgment because it exercised reasonable care to prevent discrimination and retaliation, and plaintiff failed to avail herself of defendant's internal procedures for discrimination and retaliation complaints.  Doc. 46 at 54.  In support, defendant cites *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).  Those two cases—decided on the same day—hold:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.  When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages . . . .  The defense comprises two necessary elements:  (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

**IV.    Conclusion**

Plaintiff has failed to adduce evidence sufficient to support a triable issue on her ADA discrimination and retaliation claims.  First, she has failed to show that defendant made a disability-related inquiry of her that was not job-related or not consistent with business necessity.  Second, plaintiff has failed to adduce sufficient evidence of pretext to support a triable issue on her discrimination or retaliation claims.  The court thus grants defendant's Motion for Summary Judgment (Doc. 45).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 45) is granted.

**IT IS SO ORDERED.**

**Dated this 18th day of May, 2020, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**

---

*Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.  Defendant explains that it has adopted procedures for employees to complain about discriminatory or retaliatory behavior, and contends that plaintiff could have presented to the Board of Education reasons why it shouldn't terminate her employment.  Doc. 46 at 54–55.  But it's not evident that this framework applies to plaintiff's claims, and defendant cites no ADA discrimination or retaliation cases supporting its argument that it does.  And because the court grants summary judgment under the *McDonnell Douglas* framework, the court need not decide the merits of this argument.